## Samuel E. Howe et al.
### v.
## Illinois Agricultural Works et al.

*Corporations—Liability of Stockholders on Unpaid Stock—Device to Make Stock Appear Fully Paid—Power of Court of Equity.*

1. The capital stock of a corporation is a trust fund which can not be given away or misappropriated to the prejudice of corporation creditors; and any device by which members of a corporation seek to avoid the liability imposed upon them by law is void as to creditors.

2. Shareholders can not, by private agreement with the corporation or among themselves before the formation of the corporation, make shares of stock non-assessable so as to excuse payment for such stock at its par value to creditors.

[Opinion filed April 11, 1892.]

In error to the Circuit Court of Sangamon County; the Hon. J. A. Creighton, Judge, presiding.

Messrs. GROSS & BROADWELL and CREA & EWING, for plaintiffs in error.

1. The capital stock of a corporation is the aggregate of the par value of all the shares into which the capital is divided. Cook on Stock, etc., Sec. 199.

2. It constitutes the resources with which the corporate enterprise is prosecuted, and the assets with which the creditors of the corporation are to be satisfied. Ibid.

3. The law requires that the entire capital stock shall be taken; and that its face value, in some form, shall find its way into the treasury of the corporation. Ibid.; Union Mut. L. I. Co. v. Frear Stone Mfg. Co., 97 Ill. 537.

4. That if for any reason the stockholder fails to pay for his stock, either in whole or in part, the amount remaining unpaid constitutes a trust fund to which creditors may resort. Cook on Stock, etc., Sec. 199.

5. That the directors of a corporation are trustees, standing in a fiduciary relation, not only to the stockholders but to the creditors of the corporation, and may not give away, waste or diminish the assets of the concern. Cook on Stock, etc., Sec. 648; Upton v. Tribilcock, 91 U. S. (1 Otto) 45; Alling v. Wenzel, 133 Ill. 264; Holder v. Ry. Co., 71 Ill. 106; Thompson v. Reno Savings Bank, 19 Nev. 103; S. C., 3 Amer. St. Reps. 797, and note.

6. All parties dealing with a trustee in regard to trust property, must take notice of the trust, and of the rights of the *cestui que trust;* and are chargeable with notice of everything which, on proper inquiry, they might have ascertained from *cestui que trust.* Duncan v. Jaudon, 15 Wall. 165; Shaw v. Spencer, 100 Mass. 382.

7. The contract of subscription for stock need not be in writing. It may be verbal, and may be inferred from facts and circumstances, like any other contract. Cook on Stock, etc., Sec. 52; Jackson v. Traer, 64 Iowa, 469.

No device, however plausible, though good as between the stockholders, will, as against the creditors of the corporation, deprive the corporate stock of its trust character, or excuse the stockholders from payment therefor in full. Sawyer v.

Hoag, 17 Wall. 610; Alling v. Wenzel, 133 Ill. 264; Upton v. Tribilcock, *supra.*

Messrs. GREENE & HUMPHREY and MATHENY & MATHENY for Jenny B. Coleman, Samuel Mendenhall and for Frank W. Tracy, defendants in error.

The court is referred to the case of Chrisholm v. Ferny, 65 Iowa, 333.

It is claimed that the above case establishes the proposition that because patent rights can not be taken on execution they can not be received in payment for the capital stock of a corporation. It appears that under an Iowa statute an execution against a corporation may, under certain circumstances, issue directly against stockholders personally. This applies to cases in which there has been fraud. In the case cited, a corporation was formed which issued its stock in exchange for a worthless patent right, and in consideration of the supposed "knowledge, experience and influence" of the stockholders.

The court below found that no consideration was paid for the stock, and this finding was sustained by the Supreme Court. The corporation contracted debts and became insolvent.

The court must have found that such a transaction was fraudulent under the Iowa statute, whatever the parties may have intended. The opinion is not at all sustained by the cases cited in support of it, although it is possible that under the circumstances the transaction, based as it was on nothing, was constructively fraudulent. No inquiry is made as to whether the creditors had notice that the stock was issued as paid up. No inquiry was made as to what information the stockholders had as to the value received for the stock. But as they were original parties to the issue of the stock, they knew all the facts.

The theory that a patent can not form the consideration for the purchase of the stock of a corporation, because it can not be taken on execution, is a curious one. It is certainly property, and property entitled to most valuable

privileges. Labor can not be sold on execution, yet labor may, under the law, be given in exchange for stock. Even a patent right may be taken under a creditor's bill, and therefore the law furnishes creditors with a very effective remedy. Even the conclusion of the Iowa court is confined to instances in which the value of a patent has not been established.

The main reason which the Iowa court gives for its decision is totally inapplicable here. In this State choses in action are subject to execution or attachment. All " rights, credits, moneys and effects are liable to be so taken." Union National Bank v. Byram, 131 Ill. 92.

Now, in this instance, the value of the patents had been established, and has never been overthrown to this day. No one claims that the failure of the company arose from the failure of the patents; and the value of the patents formed only a small part of the consideration paid for the stock. The whole prospect of earnings growing out of the established business, its agencies in various states, the demand for the product of the factory, including the patents themselves, only formed twenty-seven per cent of the value of the capital stock after deducting the indebtedness imposed on the company by the assumption of the firm debt.

It is now, for the first time, insisted that as 1,005 shares of stock of the Agricultural Works now stand in the name of Dr. Mendenhall, he is personally liable thereon, as on unpaid stock. The case of Wheelock v. Kost, 77 Ill., page 296, is cited as an authority; also, Griswold v. Seligman, 72 Mo. 110, and Fisher v. Seligman, 75 Mo. 13.

In the Wheelock case, it seems that Wheelock held the stock of a national bank as collateral security, for a debt due him from the bank. Shares were issued to him and he drew dividends thereon. It does not appear whether the shares were paid up or not, but, under the national banking act, the holders of shares are liable for an amount equal to the par value of the stock even after the full payment of the subscriptions.

The stock which Wheelock held was not in trust for any

one but himself. He held them as valid securities for his own protection, and had all the interest in them that any one could have. Both in law and equity he held the title, and therefore was responsible for calls upon them. If he lent his name or his paper to the bank, as he did, and took as security stock subject to calls, he was, in every aspect of the law, a stockholder, and subject to all the obligations pertaining to that character. Pledgees of stock are stockholders.

The Seligman cases are of the same character. There a corporation, indebted to an individual, issued to him certain shares of its stock as collateral security. The party held the stock in his own name and for his own benefit, and not as trustee for any one. He represented no one. In one of those cases the question is considered, how far a trustee is protected by a statute which declares that a party holding as a trustee, shall not be personally liable. The court held that statute is no protection, unless the trustee really represents some *cestui que trust*.

Section 23 of Chapter 32 of the Revised Statutes, act of 1872 (Starr & Curtis, Volume 1, p. 618), provides that no trustee, holding stock, shall be held responsible thereon, but the person or party for whom such stock is held, shall be liable.

In the cases cited above, the shares were clearly unpaid. In every one of the cases the party to whom the stock was issued held for his own security, and the certificates represented definite privileges which he claimed and enjoyed in his own behalf.

In the case at bar, Dr. Mendenhall held stock delivered to him as paid up, and, in fact, paid up in the judgment of the company, in which the law vested the power of determining in the first instance. He held the stock simply as trustee for the company, having no personal interest whatever in it. It was not pledged to him, nor did he ever either claim or receive any dividends upon it. It was a mere gratuity which the original purchasers handed over to Dr. Mendenhall to be sold for the benefit of the company primarily, but indirectly for their own benefit.

We freely admit that no man can subscribe for corporate stock known to be subject to calls, and escape liability by appending the word "trustee" after his name. It would be absurd to allow any one to do this, and cast votes and claim dividends on such stock, and then to escape responsibility by insisting that he acted on behalf of some undisclosed person. Winston v. Pipe Co., 129 Ill. 64.

Dr. Mendenhall took the stock as paid up, and as a mere depositary for the company, which was the known and avowed *cestui que trust.*

Messrs. BROWN, WHEELER & BROWN, for Jay Smith, defendant in error.

MR. JUSTICE WALL. This was a bill in chancery filed by Samuel E. Howe, Chicago Malleable Iron Company and Union National Bank of Chicago against the Illinois Agricultural Works, a corporation, and its stockholders, for the purpose of winding up the affairs of the corporation and reaching the stockholders to the extent of their liability for unpaid stock. The complainants were judgment creditors of the corporation which was organized under the general law of this State. Executions had been issued upon their judgments and returned *nulla bona.* It was charged in the bill that the stockholders had paid but fifty cents on the dollar for their stock, and as the corporation was insolvent it was sought to enforce liability for the residue as far as might be necessary to pay the judgments held by complainants.

After the bill was filed a number of other judgment creditors were, on their motion, admitted as complainants. Answers were filed by the corporation and by Smith, Tracy, Mendenhall and Mrs. L. H. Coleman, stockholders. It appears that when the cause came to be heard, the only question remaining for determination was as to the liability of the stockholders for the alleged unpaid balance on the stock, all the other assets of the corporation having been disposed of in satisfaction of liens prior to those of com-

plainants. The court, upon a final hearing, dismissed the
bill, and by writ of error the creditors bring the record to
this court, assigning error upon said decree of dismissal.

It appears that in 1883 L. II. Coleman, C. W. Post and W.
T. Reed entered into a partnership for the purpose of man-
ufacturing and selling agricultural implements. They
started with a capital of $60,000 cash, having also a parcel
of ground valued at about $7,000, containing some eight
acres, which was donated to them by parties who wished to
encourage the enterprise. At the end of the first year's
operations it was announced that the firm had cleared the
sum of $18,000 and that it was then proposed to organ-
ize a corporation with a capital stock of $3,000, to be
known as "The Illinois Agricultural Works." Tracy, Men-
denhall and Mrs. Coleman were to be stockholders in the
corporation. They knew the result of the first year's busi-
ness, actively participated in the various conferences neces-
sary to perfect the corporate organization, and were fully
advised of all the facts relating thereto. In brief, the plan
finally agreed on was to convey to the corporation all the
property of Coleman, Post & Reed in payment for all the
stock of the corporation, which was to be issued to them as
follows: To Coleman 1,500 shares, $150,000; to Post 1,000
shares, $100,000; to Reed 500 shares, $50,000. Then Cole-
man, Post & Reed were to transfer one-half of the stock
so issued to them to Mendenhall, as trustee for the company,
and Mendenhall should sell one hundred thousand dol-
lars of the stock at fifty cents on the dollar for the benefit
of the company and hold the remainder for such disposition
as might be determined thereafter. It was understood that
Tracy, Mendenhall and Mrs. Coleman, who were, as already
stated, actively concerned in the creation of the com-
pany, should have their stock at fifty cents on the dol-
lar and they so obtained it, paying therefor to the company,
and so did Smith. The certificates of 200 shares to Mrs.
Coleman, 100 to Smith, 50 to Mendenhall and 100 to Tracy
were issued November 24, 1884, by the company, and Men-
denhall, as trustee, surrendered his certificate of 1,500

shares, dated November 10th, and received another for 1,050 shares. This last certificate was dated November 27, 1884. It was arranged in the beginning that this transfer of stock to Mendenhall as trustee, should be on account of the assumption by the company of the debts of Coleman, Post & Reed, estimated at $70,000, and it was perfectly understood that the proceeds of the stock so transferred to Mendenhall should belong to the corporation and not to Coleman, Post & Reed. The property held by Coleman, Post & Reed was worth somewhere in the neighborhood of $140,000, but of course was subject to the indebtedness of $70,000, which the corporation was to assume; and it follows that while they were to hold $150,000 of "full paid" stock, it was to cost them a little less than fifty cents on the dollar. The plan thus stated and thus carried out was all settled when it was determined to organize the corporation, and all those who subsequently received stock, except Smith, were parties to the transaction and were perfectly informed as to it all. The defense interposed by Tracy, Smith, Mendenhall and Mrs. Coleman to the claim of the corporation creditors was that the stock was fully paid when it was issued to Coleman, Post & Reed and that there is no further liability in respect thereto.

It is urged that the conveyance to the corporation of all the assets of Coleman, Post & Reed was accepted by the corporation as full payment of the sum represented by the face of the stock and that though there may have been some overvaluation, yet this can not be attacked except for fraud. This transaction was had between Coleman, Post & Reed in their individual capacity on the one hand and in their corporate capacity on the other. The purpose in part was to show a complete subscription for the stock. A further purpose was to place the block of stock from which Tracy and the other new parties were to get their shares in the nominal form of paid-up stock, and in the hands of some one not an original subscriber; thus to furnish some colorable pretext for the position now assumed, that the stock was in fact paid up and that it was bought in the market and with-

Howe v. Illinois Agricultural Works.

out notice of anything to the contrary, or at least to place the burden of showing the true situation upon those who might seek to impose liability for the corporate indebtedness. It is argued that no matter how much the plant was over-valued there is no suspicion of fraud; that in addition to the actual property transferred there was great value in sundry patents and in the prospects for business, based on the success of the first year. This argument wholly ignores the fact which can not be denied, that it was not the inten-tion to convey the property clear of incumbrance, but sub-ject to the assumption of the debts of Coleman, Post & Reed of $70,000 incurred in the acquisition of the very prop-erty, leaving the real value of the transfer less than $75,000; and that while Coleman, Post & Reed were to subscribe and receive certificates for the entire stock of $300,000, they were to place one half of it in the hands of Mendenhall, as trustee for the company, and Mendenhall was to sell one hundred thousand dollars of it at fifty cents for the benefit of the company—not for the benefit of Coleman, Post & Reed. This was, in effect, a distinct recognition of the fact that the value of the transfer was not $300,000 or even $150,000; and there is no room for any serious contention to the contrary. It was in effect a subscription by Coleman, Post & Reed for only one-half of the stock. The form thus gone through was but a sham, and the whole proceeding was merely a de-vice to evade the law and to give color to the suggestion that the stock was fully paid up when it was not. Had the ar-rangement been carried out and enough of the "trustee" stock sold to pay off the debts of Coleman, Post & Reed there would have been no real change in the situation aside from the payment of debts; but instead of the partnership concern, with property worth $140,000 or $150,000, there would have been a corporation with a capital stock of $300,000, nominally paid in full and nothing in the treas-ury. Here there was a fraudulent aspect to be presented to the public. If the stock was really paid in full there should be a large working capital on hand equal to the real value of the tangible property. If not paid in full there must.

be the statutory liability of responsible stockholders. It was really not paid, and we find Mr. Coleman, who was president of the company, asserting to Mr. Loeb, who was a creditor, that the corporation had valuable assets in these unpaid subscriptions. He was thereby enabled to tide over matters with Mr. Loeb, and no doubt the same considerations were efficient in leading him and thirty-seven other creditors, aggregating in all over sixty thousand dollars, to accept the guarantee of the corporation on condition of an extension for a period of over eighteen months. The conclusion inevitably flowing from this evidence is that the matter was so arranged as that the stock should cost not exceeding fifty cents on the dollar to any of the parties, and all were to be on substantially the same footing.

The methods adopted do not disguise the real purpose, and while, as between the corporation and the stockholders, the stock may be treated as fully paid, the creditors can not be barred by what was thus done. The capital stock of a corporation is a trust fund which can not be given away or misappropriated to the prejudice of corporate creditors, and any device by which members of a corporation seek to avoid the liability imposed upon them by law is void as to creditors. Shareholders can not, by private agreement with the corporation, or among themselves before the formation of the corporation, make shares of stock non-assessable so as to excuse payment for such stock at its par value to creditors. Union Mut. L. I. Co. v. Frear Stone Mfg. Co., 97 Ill. 537; Alling v. Wenzel, 133 Ill. 264 and cases cited. A court of equity will always regard the transaction as it substantially is, stripped of all mere forms, and where there was in fact but a partial payment of the stock, it will not release the shareholder merely because his certificate declares it is fully paid and not assessable, nor will it be misled or deceived by the mere disguise of issuing full-paid stock to be transferred to a trustee for the benefit of the company.

So far as Tracy, Mendenhall and Mrs. Coleman are concerned there can be no pretense of buying the stock without notice of the facts. Not only from the testimony of other

witnesses but from their own statements, on the stand, it is clear that they not only knew all the facts, but assisted in arranging the scheme which was finally carried out. It appears, indeed, that the stock as first issued went directly to the parties according to the shares they were to take, but that Tracy objected and insisted that the stock should all be issued to Coleman, Post & Reed, and one-half should be transferred to Mendenhall, as trustee; and thereupon the original stock book was destroyed and another was obtained and the transaction was as already stated. Tracy in his testimony says the parties having the matter in charge did not understand the *modus operandi* and he had it changed. He was unwilling to take the stock unless it passed through the hands of a trustee, apparently supposing he had thereby gained some advantage from a legal standpoint. It is urged on behalf of Smith that he was an innocent purchaser of the stock in open market, and it is suggested that by virtue of Sec. 8 of the Corporation Act, where stock is transferred before being fully paid, there must be a record made of the fact in the office of the recorder of deeds, and as no such record appears, he took the stock as not assessable. We do not feel called upon to discuss this provision of the statute nor to express any opinion as to the effect of transferring unpaid stock without such record, as we find in the evidence ample proof that Smith understood the whole arrangement thoroughly. He does not deny it very pointedly; his testimony all considered leaves the clear impression that he did know all about it, as Post swears he did. Moreover, all the circumstances point that way. He was on the list with Tracy, Mendenhall and Mrs. Coleman from the beginning. He was, no doubt, fully informed by Tracy and by Post of all the leading matters involved. He knew he was paying but fifty cents, and he knew that was all anybody else paid. His certificate was issued to him, directly, the same day the others were issued. He knew the corporation was not receiving par value for his stock or for any of it; at least, we think it absolutely clear that he must have had such knowledge as to the other stock. There can be no question that

he knew it as to his own and that he also knew he was in effect getting it from the corporation. He was in no proper sense a buyer on the open market. He was in substance and effect one of the corporators, as were Tracy, Mendenhall and Mrs. Coleman, though he was not at the front as they were, and was doubtless acting, more or less, under the advice of Tracy.

It is also urged that the debts upon which these judgments were obtained were those originally of Coleman, Post & Reed, merely assumed by the corporation. By assuming them the corporation made them its own and obtained a long extension upon them. Thus it was enabled to use and enjoy the property it obtained from the original debtors. But for this the property would not have been so appropriated by the corporation. We are unable to perceive any defense on this ground.

With regard to the stock still held by Mendenhall as trustee, to wit, 1,050 shares, we think it may be said he occupies, in equity, a more favorable position than if he were the real owner. As has been shown, his holding is merely that of a trustee, for the benefit of the company. He could not apply the proceeds to his own use; what he did was in pursuance of a general plan to which all agreed, and he is, no more chargeable in this respect than were the other parties to the scheme. His holding was merely that of the company, and as we think, the fair equitable view is to regard the stock remaining in his hands as still unissued stock. He did not take it for himself, nor did he intend to, nor was it so understood by any one. We have been cited to some authorities to the effect that the holder of the stock will be charged regardless of the nature of his holding; but without stopping to consider whether such adjudications were in cases similar to this, we are disposed to hold him not responsible on the facts before us, with respect to the shares he so holds as trustee.

What might be the legal responsibility attaching to him in common with the other stockholders because they assumed to act as a corporation when the stock was not all subscribed in good faith, it is not necessary to consider.

We do not understand the bill asserts liability on that ground but merely on the ground that they hold stock not paid up in full.

We are of the opinion the decree dismissing the bill was erroneous and that Tracy, Smith, Mendenhall and Mrs. Coleman were legally responsible as holders of unpaid stock; but that Mendenhall was not so bound as to said 1,050 shares of trustee stock.

The decree is reversed and the cause remanded, with directions to take the proper account and render a decree according to the views herein expressed.

*Reversed and remanded.*