|  105  | 535 |
| f122  | 61  |

|  105. | 535 |
| s63NW | 514 |
|  130  | 608 |

|  105  | 535  |
| f151  | 2424 |

THE PENINSULAR SAVINGS BANK OF DETROIT v. THE BLACK FLAG STOVE POLISH COMPANY, JAMES C. HATHAWAY, AND ROBERT MC-DOUGALL CAMPAU.

*Corporations—Liability of stockholders to creditors—Unpaid sub-scriptions.*

1. Upon the organization of a corporation for the purpose of engaging in the manufacture of stove polish, one of the corporators, who was secretary and general manager of a stove company, which was anxious to secure a first-class article in the shape of stove polish, received, in consideration of his influence and services to be given and rendered in recommending the polish, 100 shares of the corporate stock. The corporator saw buyers, wrote letters from the stove company recommending the polish, and also recommended it at conventions of stove manufacturers which he attended, but rendered no services which took time from his customary employment. The corporation became insolvent, and a judgment creditor filed a bill to compel said corporator to pay the amount of his subscription to the capital stock for the purpose of satisfying said judgment. And it is held that the stock was issued as a gift to the defendant for his influence; that, while this might have been a sufficient consideration as between him and the corporation, it did not satisfy the requirements of the law as to creditors, to whom he is liable for the amount of his subscription.

2. The following general propositions are summarized from the opinion of Mr. Justice GRANT:

    *a*—Services rendered to a corporation in good faith consti-

tute a good consideration for the purchase of stock if reasonably commensurate with its par value.

b—The law permits individual stockholders to limit their liability for the debts of the corporation to the par value of the stock for which they subscribe; but creditors have a right to deal with and rely upon this capital stock as one of the assets of the corporation, and to demand that it shall be fully paid to meet the liabilities of the corporation, and the policy of the law, therefore, requires the utmost good faith on the part of the stockholders in the payment for their stock.

c—Any attempt to evade this liability, either by issuing stock as fully paid when it is not, or by putting in property at a value grossly in excess of its real value, or by gift, or by services, or by an agreement to render services, grossly incommensurate with their value, is void as to the public and the creditors of the corporation.

Appeal from Wayne. (Frazer, J.) Argued May 8, 1895. Decided May 28, 1895.

Bill to require defendant Campau to pay the amount of his subscription to the capital stock of defendant corporation. Complainant appeals. Decree reversed, and case remanded. The facts are stated in the opinion.

*Brennan, Donnelly & Van De Mark*, for complainant.

*F. A. Baker*, for defendant Campau.

GRANT, J. The complainant obtained a judgment in the circuit court for the county of Wayne for $2,145.82 upon two promissory notes executed by the defendant corporation, the proceeds of which were used in its business. The corporation was insolvent, and an execution was returned *nulla bona.* Thereupon this bill was filed to compel defendant Campau to pay the amount of his subscription to the capital stock for the purpose of satisfying the judgment.

The corporation was organized July 25, 1887, by the defendants Campau and Hathaway and one George B. Smith as original corporators. Campau took 100 shares, Smith 1,100, and Hathaway 800. The capital stock was

$50,000, and the number of shares 2,000. Hathaway was the only stockholder who paid any money, and he paid in $3,000. Smith turned over to the company a patent for the polish, and certain articles used in its manufacture. Mr. Campau's defense is set forth in his testimony as follows:

"Mr. Smith, who was supposed to be the patentee of this formula, came down with a sample of this polish. We manufactured a very fine class of goods, the Peninsular Stove Company did, and we had been troubled very much about getting a first-class article in the shape of stove polish. We had been imposed upon by numerous institutions, and when we found that this was a good article we were very anxious to get hold of it. They came to me and said: 'Here, this is something that you want.' In fact, we submitted it to our practical men for two or three weeks, and tried it in all sorts of ways, and they said it was a first-class article; and they said: 'If you will take an interest in this thing, using your influence to market it, we will make you a present of 100 shares of fully paid-up stock.' At the time of this conversation, in fact, at the drawing up of these articles, before they were signed, I asked Mr. Moore if this stock had any liability, and at that time Mr. Moore said, 'No.' He then repeated the question to these gentlemen. He said, 'Gentlemen, you understand this stock is fully paid up;' at which they said, 'Yes.' The stove-polish business had been run into the ground by a great many different people. They had been imposing upon all the manufacturers throughout the country by inferior articles; and it is next to impossible to introduce an article of this sort, unless some man of influence is at the head of it; somebody in trade. I was to use what influence I could. I was to write letters to the different manufacturers, who were personal friends of mine, throughout the country, stating we were using this stock, which we did. I was to do everything in my power, directly and indirectly, without interfering with my legitimate business, to assist in marketing the stock, which I did."

He further testified that he saw buyers, wrote letters from the stove company recommending it, and he also recommended it at conventions of stove manufacturers which he attended. He was at that time the secretary

and general manager of the Peninsular Stove Company. He was chosen president of the defendant corporation. He testified that he had been nominally the president of the company, but had performed no services as such officer. He had performed no services otherwise than as above stated, in causing it to be used by the Peninsular Stove Company, and in recommending its use.

It is conceded that services rendered to a corporation in good faith constitute a good consideration for the purchase of stock. *Liebke v. Knapp*, 79 Mo. 22, and *Van Cott v. Van Brunt*, 82 N. Y. 535, are illustrations of the rule. Such services, however, must be reasonably commensurate with the par value of the stock subscribed.

The corporation was organized under Act No. 232, Laws of 1885. The articles stated that the stock was actually paid in. This was not in fact true. There is no evidence that Mr. Campau entertained any intent to defraud subsequent creditors of the corporation. Undoubtedly he honestly believed that he had the legal right to make this arrangement without incurring any liability.

It is the established rule that the capital stock of a corporation constitutes a trust fund for the benefit of its creditors. *Sawyer v. Hoag*, 17 Wall. 610; *Fogg v. Blair*, 139 U. S. 118; *Howe v. Agricultural Works*, 46 Ill. App. 85; *McDaniel v. Harvey*, 51 Mo. App. 198; *Farnsworth v. Robbins*, 36 Minn. 369; *Thayer v. Mining Co.*, 40 Ill. App. 344; *Carbon Co. v. Mills*, 78 Iowa, 460; *Wetherbee v. Baker*, 35 N. J. Eq. 501; Spel. Priv. Corp. §§ 792, 810. It is unnecessary to multiply authorities. The law permits individuals to limit their liability for the debts of corporations to the par value of the stock to which they subscribe. Creditors have a right to deal with and rely upon this capital stock as one of its assets, and to demand that it shall be fully paid to meet its liabilities. The policy of the law, therefore, requires the utmost good faith on the part of stockholders in the payment of their stock. Any attempt to evade this liability either by issuing stock as fully paid when it is not, or by putting in property at a

value grossly in excess of its real value, or by gift, or by services, or by an agreement to render services, grossly incommensurate with their value, is void as to the public and creditors. This rule is also thoroughly established by the authorities.

In *Sawyer v. Hoag* the stockholder gave his check for $5,000, the full amount of his subscription, taking back a check from the company for $4,250, which was the amount of his subscription, less 15 per cent., required to be paid in cash. For this he gave his note, and it was treated as a loan by the officers of the corporation and himself. He sought to offset a claim he had against the corporation against this note. The court held that the note was in fact given for his stock, and that all the creditors were entitled to share equally in the assets of the corporation.

In *Herbert v. Uhl* (Sup.) 20 N. Y. Supp. 743, it is said:

"While it is true, under the decisions, that stock may be issued in payment for services rendered to the company, if there is evidence that the amount of stock issued for such alleged services is grossly in excess of the fair value thereof, the plaintiff has at least the right to go to the jury upon the question whether such services were actually rendered, whether they were fairly worth the amount of stock issued in alleged payment thereof, or whether the issuance of stock for alleged services was not in fact an evasion of the statute."

See, also, the authorities above cited.

Mr. Campau rendered no services which took time from his customary employment. Clearly the stock was issued to him as a gift for his influence. While this may be a sufficient consideration, as between him and the corporation, it does not satisfy the requirements of the law as to creditors. It is not a tangible asset, such as the law contemplates as a part of the capital stock of a corporation.

The decree must be reversed, with the costs of both

courts, and the case remanded for further proceedings in accordance with this opinion.

The other Justices concurred.