STEVENS v. EPISCOPAL CHURCH HISTORY CO. et al.

(Supreme Court, Appellate Division, First Department. November 11, 1910.)

1. CORPORATIONS (§ 28*)—"DE FACTO CORPORATIONS."

Where there has been an attempt by incorporators in good faith to comply with the law as to the filing of certificates of incorporation, and a certificate has been filed in one or more of the places required by law, and there has been user of the corporate name, the corporation is a "de facto corporation"; but some of the statutory steps must be taken in an attempt to comply with the law.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 26, 70; Dec. Dig. § 28.*

For other definitions, see Words and Phrases, vol. 2, pp. 1841–1843.]

2. CORPORATIONS (§ 28*)—PARTNERSHIP (§ 41*)—DE FACTO CORPORATIONS.

Under General Corporation Law (Consol. Laws, c. 23) § 5, requiring the filing of the certificate of incorporation in the office of the Secretary of State, and of a certified copy in the office of the clerk of the county in which the office of the corporation is to be located, and requiring payment of taxes and fees before filing, the execution of a certificate of incorporation without any action directing the filing thereof, or without the filing

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

thereof, does not amount to an attempt to comply with the law, and creates no liability on the signers of the certificate to perfect the incorporation, but at most is an agreement among the parties, and in transacting business in the corporate name they are liable as copartners, and there is no de facto corporation.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 26, 70; Dec. Dig. § 28;* Partnership, Cent. Dig. §§ 56, 58, 59; Dec. Dig. § 41;* Corporations, Cent. Dig. § 74.]

3. CORPORATIONS (§ 88*)—ISSUANCE OF STOCK—PAYMENT.

Stock Corporation Law (Consol. Laws, c. 59) § 55, prohibiting the issuance of stock of a corporation except for money, labor done, or property actually received for the use and lawful purposes of the corporation, is satisfied as to creditors when labor performed for the corporation after incorporation and before the issuance of the stock is paid for by stock, or where stock is actually paid for in money, or where property of a substantial nature, having a pecuniary value capable of ascertainment, is lawfully purchased by the corporation in consideration of the issuance of stock; but the statute is not satisfied by the purchase of an executory contract for the performance of services in the future.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 353; Dec. Dig. § 88.*]

4. CORPORATIONS (§ 99*)—ISSUANCE OF STOCK—PAYMENT—"PROPERTY."

Where an individual, who conceived the idea of publishing a history of the Protestant Episcopal Church in this country, obtained from bishops their promises to act as supervising editors of the history of their respective dioceses, and then organized a corporation to publish the history, and transferred to the corporation the agreements with the bishops, and received in consideration thereof stock of the corporation, the agreements, though valuable, were not property within Stock Corporation Law (Consol. Laws, c. 59) § 55, prohibiting the issuance of stock except for money, labor done, or property actually received.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 444–446; Dec. Dig. § 99.*

For other definitions, see Words and Phrases, vol. 6, pp. 5693–5728; vol. 8, pp. 7768–7770.]

5. CORPORATIONS (§ 242*)—FILING OF CERTIFICATE OF INCORPORATION—EFFECT.

A certificate of incorporation when filed is binding on the subscribers, and their liability is fixed by their subscriptions without the formal issuance of stock to them.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 945; Dec. Dig. § 242.*]

6. CORPORATIONS (§ 243*)—STOCKHOLDERS—LIABILITY.

The liability to creditors of a corporation by one receiving stock issued without consideration accrues when the stock is received because not fully paid within Stock Corporation Law (Consol. Laws, c. 59) § 56.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 952, 953; Dec. Dig. § 243.*]

7. CORPORATIONS (§§ 228, 246*)—STOCKHOLDERS—UNPAID SUBSCRIPTIONS—SEVERAL LIABILITY.

The creditors of a corporation seeking to enforce the liability of stockholders, who have not fully paid for stock issued to them, may only collect so far as necessary the amount unpaid on the stock, and, though as to them two or more stockholders may be liable, only one satisfaction may be had as to the same stock or that issued in place thereof.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 874, 878, 981, 982; Dec. Dig. §§ 228, 246.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Appeal from Special Term, New York County.

Action by Ella M. A. Stevens, executrix of Charles Ellis Stevens, deceased, against the Episcopal Church History Company and others. From a judgment dismissing the supplemental complaint, pursuant to a decision on the trial of the issues at Special Term, plaintiff appeals. Reversed, and new trial granted.

See, also, 131 App. Div. 899, 115 N. Y. Supp. 1145.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, MILLER, and DOWLING, JJ.

Charles H. Ayres (Lawrason Riggs, Jr., on the brief), for appellant. W. E. Kisselburgh, Jr., for respondents.

LAUGHLIN, J. On the 23d day of January, 1908, the plaintiff recovered a judgment against the defendant company, a domestic corporation, for the sum of $6,740.50 for services rendered to it by Charles Ellis Stevens, deceased. Execution was duly issued on the judgment on the 28th day of January, 1908, and returned wholly unsatisfied on the 3d day of March thereafter. This is a representative action for sequestration of the property of the corporation and to recover on the personal liability of the subscribers to the capital stock, which appears to be authorized in such an action (Beals v. Buffalo Cons. Co., 49 App. Div. 589, 63 N. Y. Supp. 635), and on the statutory liability imposed by section 54 of the former stock corporation law (chapter 564 of the Laws of 1890, as amended), now section 56 of the stock corporation law (chapter 59 of the Consolidated Laws).

The trial court found that the entire capital stock was, pursuant to an agreement between the subscribers therefor and the defendant Wilson, made prior to such subscriptions issued in good faith to defendant Wilson in consideration of the assignment by him to the company of certain contracts which the directors, who were the subscribers for the capital stock believed to be, and which the court found were, in fact, worth the par value of the stock.

The learned counsel for the appellant contends that the defendant company was neither a de jure nor a de facto corporation at the time the agreement to transfer the capital stock to Wilson was made and at the time of the assignment of the contracts by him to the company and the issuance of the capital stock therefor, and that therefore there could be no valid assignment of the contracts to the corporation which would furnish a consideration for the capital stock, even though the contracts constituted property within the provisions of section 42 of the former stock corporation law, as amended (now section 55 of the stock corporation law); and he further contends that the alleged contracts, if valid, were not property within the requirements of the statute, for they were not even contracts.

Prior to the 7th day of April, 1904, the defendant Wilson, who was a stockbroker, conceived the idea of publishing a history of the Protestant Episcopal Church in America, and with a view to furthering the project and of obtaining the good will and co-operation, to an extent, of the ecclesiastical authorities, according to his testimony, interviewed Bishop Satterlee of Washington, D. C., and thereafter and

on the 25th day of March, 1904, pursuant to that interview, made a formal proposition to the bishop by letter, as follows:

"In my forthcoming history of the Church in this country, it is my purpose to have an associate editor in each and every diocese. In order to insure accuracy, I propose to submit to each 'bishop, that portion of the history which appertains to his own diocese. In this way, I believe that I shall preserve the Church unity, so far as my work is concerned, that will equally appeal to all parts of the country. The work will thus become essentially a national literary monument to the Church.

"Inasmuch as there is a well-defined movement in the United States to recognize Washington as the natural center of religious thought and influence, and as the Cathedral of St. Peter and Paul is to be a national monument to the Church and inasmuch as my work, being of a national character, will emanate from Washington as the natural center; therefore, as a fitting tribute, I offer as a gratuity and benefit for your cathedral fund, the sum of twenty per centum of the gross receipts accruing from all sources from my history, both during and after its publication."

Having received no reply to his letter, he again wrote to the bishop on the 28th day of the same month, as follows:

"In connection with the offer I made you in my letter of March 25, I beg to state that as a guaranty of good faith I shall deposit all moneys accruing from all sources, from the publication of my Church history, with the American Security & Trust Company of Washington, and shall so state on all my subscription orders.

"As all moneys are received twenty per centum of the gross receipts shall be deducted for the cathedral fund and pass absolutely from my control.

"In addition, I shall leave on deposit with the American Security & Trust Company a second twenty per centum of the gross receipts, as a fixed contingent fund, which, in addition to the guaranty of twenty-five thousand dollars I have submitted, establishes a financial basis commensurate with the dignity and scope of the work."

Under date of the 30th of the same month he received a letter from the bishop, as follows:

"In reply to your letter of March 25th, and also of March 28th, in which after describing your proposed history of the Protestant Episcopal Church, with an associate editor in each diocese, you offer twenty per cent (20%) of the gross receipts, accruing from all sources, during and after the publication of the said history, for the benefit of the building fund of the Cathedral of St. Peter and St. Paul, in Washington, and also that you will deposit with the American Security & Trust Company, of Washington, D. C., the total receipts received from the history, twenty per cent. of the gross amount, to be immediately deducted for the purpose above mentioned, I would say, that I hereby accept with thanks, your generous offer; with the understanding that the Protestant Episcopal Cathedral Foundation of the District of Columbia, will not incur any financial liability thereby."

Prior to the trial of the issues herein, both Bishop Satterlee and Bishop Potter died. It is claimed in behalf of the respondents, on the testimony of Wilson, that the arrangement he had with Bishop Satterlee was not fully embraced in the correspondence quoted. He testified that the bishop agreed to become supervising editor for his own diocese and suggested Rev. C. Ernest Smith as editor to write the history of that diocese, and also suggested that he call on Bishop Potter of New York, who on being interviewed agreed to become associate editor of the history provided the deceased, Stevens, was employed to write the history of the diocese of New York. As will be seen presently, there was no claim on the part of the defendants, when the ac-

tion was commenced and issue was originally joined, nor until after the death of Bishop Potter, that there was any agreement with Bishop Potter prior to the actual incorporation of the company, or that it afforded any part of the consideration for the issuance of the capital stock to Wilson.

Wilson was without means to finance his enterprise, and he disclosed his project to the defendants Kisselburgh and Kemp and to the deceased Richard H. Van Alstyne, whose executor is a defendant, with a view to obtaining financial assistance. The trial court found that it was subsequently agreed between them that a corporation should be organized with a capital of $25,000, and that all of the capital stock should be issued to Wilson for certain agreements which he had with Bishop Satterlee and Bishop Potter and Rev. C. Ernest Smith, and that Wilson was then to transfer one-half of the capital stock to Kemp, Van Alstyne, and Kisselburgh, and that the defendants Kemp and Van Alstyne agreed to finance the enterprise until sufficient subscriptions were received to make it self-supporting.

On the 7th day of April, 1904, the defendants Kemp and Kisselburgh, and the deceased Van Alstyne signed and acknowledged a certificate for the incorporation in due form of the Episcopal Church History Company under the stock corporation law of New York. The purpose of the incorporation was stated in the certificate to be "the writing, manufacturing and publication of a history of the Protestant Episcopal Church in America." The amount of the capital stock was stated to be $25,000, consisting of 250 shares of the par value of $100 each, of which Kemp and Van Alstyne were each to take 100 shares and the defendant Kisselburgh was to take 49 shares. It appears that the certificate was also signed by Wilson; the original intention evidently being that he was to take the remaining share, but his name was subsequently erased therefrom. The amount of the capital with which the corporation was to commence business was stated to be $1,000. The board of directors was to be three, and the incorporators were designated the directors for the first year. The certificate was filed in the office of the Secretary of State on the 1st day of July, 1904, and in the office of the county clerk on the 14th of the same month. There is no evidence that any effort was made by the incorporators or by any one in their behalf to file it in either office before that time. It appears that the individuals who signed the certificate of incorporation assumed to act as directors and caused subscriptions to the history to be solicited in the name of the company as if incorporated. They held a meeting on the 20th day of April, 1904, the minutes of which show that Van Alstyne was nominated and elected president and Kemp secretary and treasurer. It appears by those minutes that Wilson was present and was invited to address the board, and that he said:

"That he had secured an agreement with Bishop Satterlee and others interested in the erection of a national cathedral at Washington, D. C., for the publication of a history of the Episcopal Church in America, and he desired to transfer such agreement to the company for twenty-five thousand dollars."

The further minutes of the meeting are as follows:

"Some discussion followed in which it was shown that this arrangement would leave no working capital. To meet this condition it was finally proposed

125 N.Y.S.—37

by Mr. Wilson that he would transfer such agreement to the company for its entire capital stock, and would transfer to Messrs. Van Alstyne, Kemp and Kisselburgh one-half thereof upon their agreement with him to advance sufficient money to finance the company, until subscriptions should begin to be received, stating that in his opinion the amount necessary therefor would not exceed ten thousand dollars."

It was thereupon unanimously resolved:

"That in the opinion of the directors the agreement between Arthur E. Wilson and Bishop Satterlee and others for the publication of the Episcopal Church History is reasonably worth upwards of twenty-five thousand dollars."

And:

"That the entire capital stock of the corporation issue to Arthur E. Wilson in consideration of the transfer by him to the corporation of his entire interest in said agreement."

Wilson at that time signed and delivered an agreement to the secretary, which, with the letters thereto attached, were kept with the minutes and subsequently delivered to the receiver of the corporation. The agreement was as follows:

"In consideration of the issuance and delivery to me of the entire capital stock of the Episcopal Church History Company, the receipt whereof is hereby acknowledged, I hereby transfer, sell and assign all my interest in and to a certain contract or agreement, embodied in the annexed letters, and in whatever proceeds may accrue therefrom, unto the said Episcopal Church History Company.

"In witness whereof I have subscribed my name this 20th day of April, 1904."

The letters annexed to the agreement were the two letters written by Wilson to Bishop Satterlee and the bishop's letter to him already quoted. At the same time a certificate of stock in due form was executed by the president and by the treasurer of the company, marked "No. 1," for the entire capital stock of 250 shares for the defendant Wilson. The stub of the certificate contains the recital, "Issued for contract, etc., as per minutes," and shows that it was issued to Wilson and bears date the same day. When received in evidence, it bore the signature of Wilson, above which was the following, "Received the above certificate Nov. 25, 1904," and a further indorsement showing that it was canceled on said November 25th, and that certificates 2, 3, 4, and 5 were on that day issued in its place. Those certificates were as follows: One for 125 shares issued to the defendant Wilson, another for 42 shares issued to the deceased Van Alstyne, and another for 42 shares issued to the defendant Kemp, and another for 41 shares issued to the defendant Kisselburgh.

The journal of the corporation contained an entry as follows:

1904.
April 29. | 1 | To Contract acct. A.
          |   |     E. Wilson, Dr.......................... $25,000
          | 2 | To capital stock................................... $25,000

The ledger of the corporation contained the following entry:

Contract with Bishop Satterlee.

1904.
Apl. 29. Acct. A. E. Wilson.................................... |1|  $25,000

On said 20th day of April, 1904, the directors adopted by-laws; but no other meeting of the directors was shown to have been held until the 26th day of September thereafter. A formal agreement in writing appears to have been made between the defendants Wilson, Kemp, and Kisselburgh and the deceased Van Alstyne on the 20th day of April, 1904, which recites that Wilson was the owner of an agreement between himself and Bishop Satterlee "and others interested in the erection of the Cathedral of Saints Peter and Paul at Washington, D. C., for the publication of a history of the Episcopal Church in America," and recites their agreement as herein stated, with respect to financing the publication, and that pursuant thereto the sum of $4,500 had been advanced, and that Wilson "has assigned his said agreement with the said bishop and others" to the company for the entire capital stock transferred to the other parties to the agreement. The agreement also limits the amount that was to be advanced pending the receipt of funds from subscriptions for the history.

The learned counsel for the respondent contends that the execution of the certificate of incorporation constituted the defendant a corporation de facto, and that it was then competent for it to enter into the agreement with Wilson to transfer the capital stock in consideration of the contract. This becomes an important question, for there is no evidence that any new agreement was made on the subject when or after the certificate of incorporation was filed, or upon which even a ratification could be predicated. Therefore, according to this record, the agreement was made before incorporation or not at all. Section 5 of the former general corporation law, as amended (now section 5 of the general corporation law [Consol. Laws, c. 23]), required that the certificate of incorporation should be filed in the office of the Secretary of State, and that a certified copy thereof or a duplicate original should be similarly filed in the office of the clerk of the county in which the office of the corporation was to be located, and further provided as follows:

"All taxes required by law to be paid before or upon incorporation and the fees for filing and recording such certificate must be paid before filing. No corporation shall exercise any corporate powers or privileges until such taxes and fees have been paid."

The execution of the certificate without any action directing or authorizing the filing thereof and without the filing thereof did not even constitute an attempt to comply with the requirements of the statute and created no liability and imposed no obligation on the parties who signed it to perfect the incorporation. At most, it merely constituted an agreement among themselves, and in transacting business in the name of the corporation they doubtless became liable as copartners; but in no view of the case can it be maintained that the mere execution of the certificate created a corporation de facto. Of course, where there has been an attempt in good faith to comply with the requirements of the law with respect to filing a certificate of incorporation, and a certificate has been filed in one or more of the places required by law, and there has been user of the corporate name, the corporation will be deemed a corporation de facto, and no one other

than the people of the state can question the validity of its existence; but some of the statutory steps must be taken in an attempt to comply with the requirements of the law, and the mere execution of a paper which is not filed and does not become a public record is insufficient, and this may be inquired into collaterally by any person whose interests are affected thereby. McLennan v. Hopkins, 2 Kan. App. 260, 41 Pac. 1061; Jones v. Aspen Hardware Co., 21 Colo. 263, 40 Pac. 457, 29 L. R. A. 143, 52 Am. St. Rep. 220; Van Buren v. Reformed Church, 62 Barb. 495; Lamming v. Galusha, 81 Hun, 247, 30 N. Y. Supp. 767, affirmed 151 N. Y. 648, 45 N. E. 1132; Card v. Moore, 68 App. Div. 327, 74 N. Y. Supp. 18, affirmed 173 N. Y. 598, 66 N. E. 1105; Eaton v. Aspinwall, 19 N. Y. 119; Childs v. Smith, 55 Barb. 45, reversed on another point, 46 N. Y. 34.

If we are right in this view of the case, then it is manifest that the capital stock has been issued without any consideration, and the good faith of the individual defendants is of no avail.

Moreover, we are of opinion that the alleged contracts did not constitute property within the requirements of said section 42 of the former stock corporation law, which provided as follows:

"No corporation shall issue either stock or bonds except for money, labor done or property actually received for the use and lawful purposes of such corporation. Any corporation may purchase any property authorized by its certificate of incorporation, or necessary for the use and lawful purposes of such corporation, and may issue stock to the amount of the value thereof in payment therefor, and the stock so issued shall be full paid stock and not liable to any further call, neither shall the holder thereof be liable for any further payment under any of the provisions of this chapter; and in the absence of fraud in the transaction the judgment of the directors as to the value of the property purchased shall be conclusive; and in all statements and reports of the corporation, by law required to be published or filed, this stock shall not be stated or reported as being issued for cash paid to the corporation, but shall be reported as issued for property purchased."

At most, the alleged contracts as now claimed on the testimony of Wilson showed that the two bishops looked upon the project with favor and were willing to co-operate to the extent of becoming supervising editors and of suggesting competent editors to write the history of their respective dioceses. This understanding was had with Wilson personally. It does not appear that at the time of the alleged assignment of the contract to the corporation either Bishop Satterlee or Bishop Potter consented to the organization of this corporation, or was aware that it was to be organized, or that the alleged contracts be transferred to it; nor does it appear that the corporation assumed Wilson's obligation to pay to the cathedral fund 20 per cent. of the gross receipts. The understanding between Wilson and the bishops had no binding force. Nothing had been done at that time by either party on the faith of it. It was founded on no consideration. He volunteered as a gratuity to give 20 per cent. of the gross receipts to the cathedral fund. Nothing had been paid on the agreement, and the correspondence clearly shows that what was expected of Bishop Satterlee and what he promised to do was not conditioned upon the payment of the 20 per cent. The company's agents in soliciting subscriptions represented that they came from or represented Bishop Satter-

lee, and later on he published a statement showing that the only connection he had with the publications was to supervise the history of his diocese, and after that the company could not obtain subscriptions and it failed.

It is now claimed on Wilson's testimony that the decedent Stevens was hired pursuant to the agreement between Wilson and Bishop Potter, and that Bishop Potter's agreement to become an associate editor was conditioned upon the employment of Stevens. The testimony of Wilson in this regard is wholly discredited by his own testimony and by other evidence. Bishop Potter at most merely consented to do as Bishop Satterlee had agreed to do, to suggest a competent man to write the history of his diocese and to supervise that part of the work. The bishops were at liberty at any moment to withdraw from the project, and no action for specific performance or for damages could have been successfully maintained against either of them. Moreover, when the original answer of the defendant Wilson was served, it was therein expressly admitted as follows:

"That the defendants named in said complaint agreed that all the stock in said corporation should be issued to this defendant as fully paid in consideration of the transfer by this defendant to said corporation of his rights in a contract contained in certain letters between this defendant and Bishop Satterlee; that this defendant agreed to transfer to the defendants Van Alstyne, Kemp, and Kisselburgh one-half of the stock so to be issued to him as fully paid; that after the incorporation of the defendant corporation, pursuant to such agreement, a certificate for 250 shares of the capital stock of said corporation was issued to this defendant, which certificate was surrendered and new certificate issued in place thereof, one for 125 shares to this defendant, one for 42 shares to defendant Van Alstyne, and one for 42 shares to defendant Kemp, and one for 41 shares to defendant Kisselburgh, all purporting to represent fully paid stock."

And, as already observed, it was not until after the death of Bishop Potter that it was claimed that there was any contract or agreement with him on the 20th day of April, 1904, or that any agreement or contract constituted any part of the consideration for the transfer of the capital stock to Wilson other than the letters from Wilson to Bishop Satterlee and the bishop's reply thereto.

The requirements of the statute with respect to the payment to be made for the capital stock of a corporation which were designed for the benefit and protection of creditors can only be satisfied as to creditors by labor theretofore performed, by actual payment in money, or by the purchase, at what is in good faith deemed its fair and reasonable value, of property of a substantial nature having a pecuniary value capable of ascertainment and which the corporation might lawfully purchase as necessary to its business. Camden v. Stuart, 144 U. S. 104, 12 Sup. Ct. 585, 36 L. Ed. 363; Powell v. Murray, 3 App. Div. 273, 38 N. Y. Supp. 233; Savings Bk. v. Stove Polish Co., 105 Mich. 535, 63 N. W. 514; Thompson on Stockholders, § 134. It is manifest that this requirement cannot be satisfied by the purchase of an executory contract for the performance of services in futuro. At most, the only express agreement which in any view of the evidence can be claimed to have been made by the bishops is to render personal services in editing the history for the publication of which the corporation

was organized. Although, as already observed, we do not think that there was any binding contract between Wilson and either Bishop Satterlee or Bishop Potter, yet if there were, and it were assignable, it could be of no greater value and have no more effect than if negotiated and made by and between the corporation and the bishops without the intervention of Wilson. It seems to me that, if the stock had been issued to Bishops Satterlee and Potter for their influence or good will and agreement to act as supervising editors either for their respective dioceses or of the entire work, such contract, while perhaps very valuable, would not constitute property within the requirements of the statute in question, any more than an agreement on the part of an individual to become manager for a period at a given salary. The only work or service for which the issuance of capital stock is authorized is work or services performed before the stock is issued, and it has been held that this does not embrace services in promoting the corporation. Herbert v. Duryea, 34 App. Div. 478, 54 N. Y. Supp. 311, affirmed 164 N. Y. 596, 58 N. E. 1088. It has reference to labor performed for the corporation after its incorporation. Here no work or services had been performed by either Bishop Satterlee or Bishop Potter when the alleged contract was assigned to the corporation and the capital stock was issued therefor.

The certificate, of course, when filed, became binding on the subscribers, and their liability is fixed by their subscriptions without the formal issuance of stock to them. United Growers Co. v. Eisner, 22 App. Div. 1, 47 N. Y. Supp. 906; Beals, v. Buffalo Cons. Co., 49 App. Div. 589, 63 N. Y. Supp. 635. The liability of Wilson accrued when he received the stock which was issued without consideration, and therefore was "not fully paid," within the provisions of said section 54 of the former stock corporation law. Flour City Nat. Bank v. Shire, 88 App. Div. 401, 84 N. Y. Supp. 810, affirmed 179 N. Y. 587, 72 N. E. 1141. Of course, the creditors are only entitled to collect, so far as necessary, the amount unpaid on the capital stock, and, although as to them two or more defendants may be liable, only one satisfaction may be had as to the same stock or that issued in place thereof.

It follows, therefore, that the judgment should be reversed, and a new trial granted, with costs to the appellant to abide the event. All concur.