## GLEDHILL v. FISHER & CO.

1. CORPORATIONS—HOLDING COMPANIES.
    Under the law of this State one corporation may organize and
    hold the entire capital stock of a subsidiary corporation (2
    Comp. Laws 1929, § 9968).

2. SAME—SEPARATE ENTITY DISREGARDED WHEN USED TO AVOID
LEGAL OBLIGATIONS.
    When a corporation exists as a device to evade legal obligations,
    the courts, without regard to actual fraud, will disregard the
    entity theory.

3. SAME—SEPARATE ENTITY—CONSUMMATION OF A WRONG.
    To justify treating sole stockholder or holding company liable as
    responsible for a subsidiary corporation, it is not enough that
    the subsidiary is so organized and controlled as to make it
    merely an instrumentality, conduit or adjunct of its stock-
    holders but it must further appear that to recognize their sepa-
    rate entities would aid in the consummation of a wrong.

4. SAME—RELIEF AGAINST PARENT CORPORATION.
    Relief against a parent corporation should be granted only if a
    refusal to do so would result in an unjust loss or injury to the
    complainant since a refusal to recognize the ordinary immunity
    of stockholders not only overturns a basic provision of stat-
    utory or common law but is also contrary to a vital economic
    policy of the whole corporate concept.

5. SAME—LAND CONTRACT OF SUBSIDIARY—REAL PARTY IN INTEREST.
    Parent corporation held, not liable on land contract of its wholly-
    owned subsidiary where plaintiff vendors did not know of real
    party in interest when contract was executed, relied upon cor-
    porate vendee as sole· and actual purchaser and advance no
    claim that the parent corporation diverted assets of subsidiary
    in suit brought after insolvency of vendee, and property had
    depreciated in value so as to inadequately secure balance of
    purchase price.

6. SAME—EVASION OF PERSONAL RESPONSIBILITY—FRAUD.

Organization of a corporation for the avowed purpose of avoiding personal responsibility does not in itself constitute fraud justifying the disregard of the corporate entity and those dealing with a corporation know, or are presumed to know, the law in this regard.

7. SAME—CAPITAL STOCK A TRUST FUND.

The capital stock of a corporation constitutes a trust fund for the payment of debts of the corporation.

8. SAME—HOLDING COMPANIES.

A stockholder of a corporation that owns another corporation is not a stockholder in the latter.

9. SAME—FORMATION OF SUBSIDIARY—PURPOSE.

A corporation may form a subsidiary to protect itself from personal liability and make only the capital of the subsidiary liable for the latter's obligations.

10. VENDOR AND PURCHASER—REFORMATION OF INSTRUMENTS—FRAUD —CORPORATIONS.

In suit by land contract vendors to set aside agreement cancelling the land contract and to reform contract to hold alleged parent corporation of now insolvent vendee corporation liable as purchaser, record *held*, to show that no fraud was committed in the purchase of the property without disclosing the ownership of the vendee's capital stock, where there is no showing that any reliance was placed on who the purchaser was, a large down payment was made and plaintiffs took back their property and retained all payments made.

11. CORPORATIONS—OWNERSHIP OF SUBSIDIARIES—STATUTES.

Statute permitting ownership of a subsidiary cannot be set aside, or disregarded, and the individual stockholders, whether personal or corporate, reached when the corporation was neither organized, conducted or used for the perpetration of a fraud (2 Comp. Laws 1929, § 9968).

12. SAME—CONTROL—PERSONAL LIABILITY.

The owners of the capital stock, through their voting power, can control a corporation, and if they properly exercise this control for lawful purposes and their stock is fully paid up, they are immune from personal liability.

13. SAME—ENGLISH CORPORATIONS—REMEDY OF CREDITORS.

Those dealing with an English corporation, or contracting with it, are limited in their recovery against the corporation to the

property owned and possessed by it, held in trust by it or contributed by subscribers to its capital stock.

14. SAME—FUNDAMENTAL CONCEPTION—CAPITAL STOCK—LIMITATION OF CONTRACTUAL LIABILITY.

The fundamental conception of a private domestic corporation is that it is an artificial entity authorized to be created to engage in any lawful business, separate and distinct from the holders of its individual stock, to enable persons to pool their interests to the extent of their several contributions to the capital stock to carry on such business by the venture or stake of its capital stock and it is this capital stock which creditors may have recourse to to enforce contractual liability and which limits such liability.

15. REFORMATION OF INSTRUMENTS — LAND CONTRACTS — CORPORATIONS.

In land contract vendors' suit to set aside agreement with insolvent corporate vendee to cancel the contract, and to reform the original contract to make alleged parent corporation liable thereunder, such original contract sought to be enforced despite release and cancellation must have been one originally in which vendors were entitled to sue vendee's stockholders upon, and nothing said by representatives of the vendee or its stockholders at the time of cancellation could affect the liability of the individual stockholders in the vendee corporation.

16. CORPORATIONS — PARENT AND SUBSIDIARY COMPANIES — ORGANIZATION.

In suit to enforce liability against alleged parent corporation of insolvent corporate land contract vendee, record *held*, insufficient to show vendee was the agent or tool of such parent corporation or that subsidiary was not organized in good faith to pay for, acquire and hold property purchased.

17. FRAUD—CORPORATIONS—AUTHORIZED ACTS.

Individuals and corporations which do that which, by the Constitution and laws of the State, they are authorized to do, cannot be held guilty of fraud for complying with the law and exercising authorized powers and duties.

NELSON SHARPE, J., dissenting.

Appeal from Wayne; Webster (Clyde I.), J. Submitted January 15, 1935. (Docket No. 84, Calendar No. 38,194.) Decided September 9, 1935.

Bill by George E. Gledhill and wife against Fisher & Company, a Michigan corporation, and others to set aside an agreement cancelling a land contract and to reform said land contract. Decree for plaintiffs. Defendants appeal. Reversed.

*Harold R. Martin,* for plaintiffs.

*Monaghan, Crowley, Reilley & Kellogg* (*Peter J. Monaghan* and *O. Regis McGuirk,* of counsel), for defendants.

BUSHNELL, J. The Wesbrook-Lane Properties Corporation, whose name was subsequently changed to United Realty & Construction Company, was formed for lawful purposes, including the purchasing, holding and dealing in real estate. Its entire original capital was supplied, and its entire stock owned, by the New Center Development Corporation, which under the law of Michigan had the legal right to hold the stock. All of the original capital of the New Center Development Corporation was in turn supplied by Fisher & Company, which owns the stock of the New Center Development Corporation. All three corporations were organized for similar purposes.

In holding that the corporate entity should be disregarded and Fisher & Company be held liable as the actual vendee under the land contract between plaintiffs and the Wesbrook-Lane Properties Corporation, Mr. Justice NELSON SHARPE relies largely on the following quotation from *People, ex rel. Attorney General,* v. *Michigan Bell Telephone Co.,* 246 Mich. 198 (P. U. R. 1929 B, 455, P. U. R. 1929 E, 27), wherein the court said:

"Where a corporation is so organized and controlled and its affairs so conducted as to make it a

mere instrumentality or agent or adjunct of another corporation, its separate existence as a distinct corporate entity will be ignored and the two corporations will be regarded in legal contemplation as one unit.''

However, in that case the disregard of the corporate entity was impelled by the finding of the court that the relationship of parent and subsidiary was being used as a device to justify rates which were not based upon the real cost to the public utility of the service for which it charged, the court distinctly stating:

''When a corporation exists as a device to evade legal obligations, the courts, without regard to actual fraud, will disregard the entity theory.''

Appellees also rely on *Old Ben Coal Co.* v. *Universal Coal Co.,* 248 Mich. 486, in which it again was held that the subsidiary was a mere device of trade in order to evade liability. The record in that case shows that the plaintiff claimed not only undue domination and control over the subsidiary by the parent corporation, but, in addition, that this control was exercised by the parent corporation in such a manner as to defraud and wrong the complainant. It was alleged that the Universal Coal Company was organized by Price Hill Colliery Company for the purpose of selling the latter's coal; that after a large judgment was rendered against the Universal Coal Company, the parent corporation immediately organized the Universal Coal Sales Company and transferred to it all the assets of the Universal Coal Company for the fraudulent purpose of defeating the satisfaction of plaintiff's judgment.

Before the corporate entity may be properly disregarded and the parent corporation held liable for the acts of its subsidiary, I believe it must be shown

not only that undue domination and control was exercised by the parent corporation over the subsidiary, but also that this control was exercised in such a manner as to defraud and wrong the complainant, and that unjust loss or injury will be suffered by the complainant as the result of such domination unless the parent corporation be held liable. The rule is correctly stated by Ballantine in an article on the separate entity of corporations, in 60 American Law Review, page 28, as follows:

"But to justify treating the sole stockholder or holding company as responsible it is not enough that the subsidiary is so organized and controlled as to make it 'merely an instrumentality, conduit or adjunct' of its stockholders. It must further appear that to recognize their separate entities would aid in the consummation of a wrong."

In Powell on "Parent and Subsidiary Corporations," extensively quoted by both parties to this suit, the proper limitation on the rule is stated on page 6 of the text as follows:

"A refusal to recognize the ordinary immunity of stockholders not only overturns a basic provision of statutory or common law, but is also contrary to a vital economic policy underlying the whole corporate concept. Such a result must therefore be viewed as an extraordinary exception and should be permitted only in cases in which it is necessary in order to promote justice. Relief against the parent corporation, therefore, should be granted only if a refusal to do so would result in an unjust loss or injury to the complainant."

In the case at bar I am unable to find that any control exercised over the Wesbrook-Lane Properties Corporation by Fisher & Company was exercised in such a manner as to defraud or wrong the

plaintiffs, or that such domination was in any way injurious to them. In entering into the land contract, plaintiffs relied entirely upon the Wesbrook-Lane Corporation as the sole and actual purchaser. There was no representation by Fisher & Company that it was the real party in interest or that its responsibility was in back of the Wesbrook-Lane Corporation. In fact, plaintiffs did not know at that time that their vendee was a subsidiary of the New Center Corporation or of Fisher & Company. The articles of association of the Wesbrook-Lane Properties Corporation, showing the paid-in capital, were a matter of public record, and could have been examined by plaintiffs or anyone else. While it is true that the corporation was originally organized with a capital of but $25,000, later increased to $50,000, and that it subsequently entered into a large number of contracts for the purchase of land, involving large obligations, the vendors with whom it dealt retained title to the property sold as security. Plaintiffs sold their property for $125,000, of which $15,000 was paid down. Interest payments were met for a number of years, and the balance was reduced to $100,974.43. This balance was adequately secured, were it not for the subsequent depreciation in values. There is no claim whatsoever of any diversion of assets by Fisher & Company from the Wesbrook-Lane Properties Corporation at any time. As a matter of fact, the record shows that over $400,000 was advanced to that corporation at various times by the New Center Development Corporation, subsidiary of Fisher & Company.

The organization of a corporation for the avowed purpose of avoiding personal responsibility does not in itself constitute fraud justifying the disregard of the corporate entity. In *Elenkrieg* v. *Siebrecht*, 238

N. Y. 254 (144 N. E. 519, 34 A. L. R. 592), the court stated:

"Whether or not the corporation is the creature of Siebrecht is not a determining feature. Whether it be a subterfuge is misleading. Many a man incorporates his business or his property and is the dominant and controlling feature of the corporation. He may do so for the very purpose of escaping personal liability."

Wormser, in his "Disregard of the Corporate Fiction and Allied Corporate Problems," goes far in holding a parent corporation liable for the debts of its subsidiary where the latter is formed for a fraudulent purpose, but he distinctly limits the rule as follows (p. 18):

"It follows that no fraud is committed in incorporating for the precise purpose of avoiding and escaping personal responsibility. Indeed, that is why most people incorporate, and those dealing with corporations know, or at least are presumed to know, the law in this regard."

The law permitted a corporation to own and hold stock in a subsidiary. 2 Comp. Laws 1929, §§ 9968, 10018–10026. The capital stock constituted a trust fund for the payment of the debts of the corporation. *Clark* v. *E. C. Clark Machine Co.*, 151 Mich. 416; *Peninsular Savings Bank of Detroit* v. *Black Flag Stove Polish Co.*, 105 Mich. 535. A stockholder in a corporation that owns another is not a stockholder in the latter. *Sabre* v. *United Traction & Electric Co.*, 225 Fed. 601. A subsidiary may be formed for the very reason that prompts individuals to form corporations, to protect themselves from personal liability, to make only its capital liable, to say to those that deal with it, "here is the amount

of our capital stock; we are a *bona fide* corporation organized for legitimate purposes and doing business in a legal manner. If you want to deal with us on the basis of our liability as shown by our capital set up, you may do so, and if not, you may refrain from so doing.'' There was no fraud in the purchase of the property by the subsidiary without disclosing the ownership of its capital stock. The record does not show that any reliance was placed on who the purchasers were. It was a time when there was a tremendous inflation in real estate, as evidenced by the many cases that have reached this court. The depression and accompanying deflation in values were not foreseen. Plaintiffs and their vendee agreed upon a price. Plaintiffs knew or should have known that they could only look to the corporation vendee, or the property in the event of a default. A large down payment was made, the depression came, plaintiffs took back their property and retained all that had been paid on it by vendees. Even had they known that the capital stock was owned by solvent stockholders, the latter were immune from liability. The statute permitting ownership of a subsidiary cannot be set aside, or disregarded, and the individual stockholders, whether personal or corporate, reached, when the corporation was neither organized, conducted or used for perpetration of a fraud. The owners of the capital stock, through their voting power, can control a corporation. If they properly exercise this control for lawful purposes and their stock is fully paid up, they are immune from personal liability. The very purpose of using the corporate form of doing business may be to limit the liability of the stockholders, and, as stated in *Donnell* v. *Herring-Hall-Marvin Safe Co.,* 208 U. S. 267 (28 Sup. Ct. 288), ''to inter-

pose a nonconductor through which, in matters of contract, it is impossible to see the men behind." Also, see, *Rough* v. *Breitung*, 117 Mich. 48; *Park Bank* v. *Remsen*, 158 U. S. 337 (15 Sup. Ct. 891); *Hale* v. *Henkel*, 201 U. S. 43 (26 Sup. Ct. 370); *Hollins* v. *Brierfield Coal & Iron Co.*, 150 U. S. 371 (14 Sup. Ct. 127); *J. J. McCaskill Co.* v. *United States*, 216 U. S. 504 (30 Sup. Ct. 386).

We need not go into the history of corporations, except to state that the one thing which distinguished all English corporations, whether the idea was borrowed from the Roman or canon law or not, is that whether a private corporation was considered as a delegation of the sovereign power of the government or the theory was dominant that the capital contributions of the members constituted a trust fund for the benefit of its shareholders, or the individual contributions to the joint stock constituted personal property, was that those dealing with the corporation or contracting with it were limited in their recovery against the corporation to the property owned and possessed by it, held in trust by the corporation, contributed by subscribers to its capital stock. 1 Blackstone's Commentaries, p. 484, goes so far as to say:

"The debts of a corporation either to or from it are totally extinguished by its dissolution."

Whether this is precisely true or not, we need not consider. Certainly as early as the year book of 19 Henry VI, 80, it was held that relief could not be had against the members of a corporation for its debts. As stated in *Myers* v. *Irwin*, 2 S. & R. (Pa.) 368, 371,

"The personal responsibility of the stockholders is inconsistent with the nature of the body corporate."

The conception of Chief Justice Marshall of a corporation is set forth in *Trustees of Dartmouth College* v. *Woodward,* 4 Wheat. (17 U. S.), 518. The fundamental conception of a private corporation created under the Constitution and law of this State is that it is an artificial entity authorized to be created to engage in any lawful business, separate and distinct from the holders of its individual stock, authorized by law to be created to enable persons to pool their interests to the extent of their several contributions to the capital stock to carry on such lawful business by the venture or stake of its capital stock in manufacturing, trade or commerce. It is this capital stock which creditors know they may have recourse to to enforce the corporation's contractual liability and which everyone who deals with the corporation is legally charged with knowing is the limit of such liability. To permit a creditor who contracted with his eyes open and charged with actual and constructive notice of the limitations upon the corporation's liability to go behind the corporate organization and reach the property of individual stockholders is to overturn the entire historic and legal conception of a private corporation, and its effect to discourage the joint venture of combined capital in industrial enterprises and to discourage ventures in business and commercial enterprises.

The original contract sought to be enforced despite its release and cancellation must of itself have been one originally in which the plaintiffs were entitled to sue the individual stockholders in the corporation upon. Nothing that was said by any of the representatives of the corporation or of the stockholders at the time of the cancellation or surrender of this contract could affect the liability of the individual stockholders in the defendant (sub-

sidiary) corporation. At the time the contract was entered into, no inquiry was made as to who constituted the incorporators of the defendant corporation. Plaintiffs dealt with the corporation just as they would have dealt with any other company in reliance upon the capital stock of the purchasing company and the inherent value of the real estate itself. There is no proof in this case that the defendant (subsidiary) corporation was in any way the agent or tool of the corporation which controlled its capital stock, or that it was not a corporation organized in good faith to pay for, acquire and hold the property purchased. Under the Constitution and laws of this State, the defendant (parent) corporation had a right to organize a subsidiary corporation and to own and control its capital stock. Those individuals and corporations which do that which, by the Constitution and laws of the State, they are authorized to do, cannot be held guilty of fraud for complying with the law and exercising the powers and duties which the Constitution and laws say they may exercise.

The decree is reversed and the bill of complaint dismissed, with costs to defendants.

POTTER, C. J., and FEAD, BUTZEL, and EDWARD M. SHARPE, JJ., concurred with BUSHNELL, J. NORTH and WIEST, JJ., concurred in the result.

NELSON SHARPE, J. (*dissenting*). On December 14, 1928, the plaintiffs executed a land contract for the sale of certain real estate in the city of Detroit to the defendant Wesbrook-Lane Properties Corporation for the sum of $125,000, of which $15,000 was then paid and the balance, including interest, to be paid in semi-annual installments of $5,000 each, the entire amount to be fully paid within seven years

from that date. Certain payments thereon were made, the last one on June 14, 1931, leaving unpaid at that time the sum of $100,974.43. The name of the vendee was changed to United Realty & Con struction Company on February 17, 1930. On January 13, 1932, an agreement was entered into between the vendors and the vendee under its changed name whereby the land contract was canceled and each of the parties discharged from any liability or obligation thereunder.

On December 20, 1932, the plaintiffs filed the bill of complaint herein. In it, after setting forth the execution of the land contract and its cancellation, they alleged that the defendants Fisher & Company and the New Center Development Corporation "were the actual principals as purchasers under said land contract;" that the cancellation agreement "was procured through the fraudulent concealment by said defendants" of such fact; that the vendee named in the contract was but an adjunct, branch or instrumentality of the other defendants, and was the "means" through which their business in making such purchase was conducted, and that, if plaintiffs had had knowledge thereof, the cancellation agreement would not have been executed by them.

In their prayer for relief they ask for a finding that the cancellation agreement was procured by fraud on the part of the defendants and that it be set aside and adjudged void and the contract "be reinstated, reformed to show said defendants, Fisher & Company and/or New Center Development Corporation, as the purchaser thereunder; and that said defendants be decreed liable to pay plaintiffs the amount due and unpaid thereunder, account principal, interest and taxes."

After the submission of proofs the trial court found the vendee in the contract and the New Center Development Corporation "were and are agents, adjuncts or instrumentalities of defendant Fisher & Company, which was the undisclosed principal in said transaction," and "that plaintiffs were induced, by false and fraudulent representations and fraudulent concealment" to make the cancellation agreement.

A decree was entered setting aside this agreement and reforming the contract by making the defendant Fisher & Company the real and actual vendee therein, and adjudging it liable for the unpaid balance.

The appeal of the defendants presents three questions:

1. Was the relationship of Fisher & Company to the Wesbrook-Lane Properties Corporation of such a nature as to make it chargeable with the obligation entered into by that corporation with the plaintiffs?

2. Was the cancellation agreement obtained by false and fraudulent representations and concealment?

3. Could reformation of the contract be had, it being a sealed instrument?

Upon the hearing the parties stipulated:

"1. That all of the original capital of Wesbrook-Lane Properties Corporation, now United Realty & Construction Company, was supplied by New Center Development Corporation, and that all the stock of said United Realty & Construction Company has been and is carried as an asset of New Center Development Corporation.

"2. That all of the original capital of New Center Development Corporation was supplied by Fisher & Company and that all the stock of said New Center Development Corporation has been and is carried as an asset of Fisher & Company.

"3.   No dividends have ever been distributed by either United Realty & Construction Company or New Center Development Corporation."

Fisher & Company, a corporation of which the stock was principally owned by six brothers whose surnames were Fisher, was organized in 1925 for the purpose of dealing in real estate and practically every other kind of business. Its paid-in capital stock, as shown by its 1927 report to the secretary of State, was $1,224,700 in cash and it had $25,026,000 in property. Its board of directors at that time was composed of the six brothers and Clarence R. Bitting.

The New Center Development Corporation was organized in December, 1926. Its purposes were substantially the same as those of Fisher & Company. Its annual report for 1928 stated that its amount of paid-in capital was $100,000. Its board of directors in 1927 was composed of the same persons as Fisher & Company and another brother, H. A. Fisher, who, however, owned no stock therein.

The contract with plaintiffs was entered into on December 14, 1928. It also appears in the stipulation that at that time the New Center Development Corporation was indebted to Fisher & Company in the sum of $20,457,117.07, and that on the date the contract was canceled, January 13, 1932, this indebtedness had increased to $32,166,098.89; that on December 14, 1928, the United Realty & Construction Company was indebted to the New Center Development Corporation in the sum of $123,500, and such indebtedness was increased on January 13, 1932, to $417,329.07.

1.   Upon the first of these questions there is little, if any, dispute as to the facts. In 1928, Clarence R. Bitting, of Detroit, was a director of Fisher & Com-

pany and in its employ under contract as its managing director. Karl A. Dietrich and Bruce A. Garland, in November, 1928, were engaged in business in Detroit as real estate brokers. The New Center Development Corporation had been organized in 1926. None of the Fisher brothers appeared as stockholders therein. It had acquired considerable property in Detroit, on a part of which what is known as the Fisher Building was erected. Fisher & Company was desirous of securing nearby property on which to erect an apartment building and for store purposes. Both Dietrich and Garland had interviews with Bitting relative to the purchase of this property. They were all of the opinion that, if either the New Center Development Corporation or Fisher & Company were known to be interested, exorbitant prices would be asked for it. On a train on their way to New York in November, 1928, the matter was discussed by Dietrich and Bitting, and Dietrich then told Bitting that he believed that John Lane, an officer in the Wesbrook-Lane Realty Corporation, would permit the use of his name in making such purchases. Bitting told Dietrich to call at the Fisher & Company office in New York the next morning and he would be told whether to make the purchases or not. Dietrich called at the office as arranged, and, while Bitting was not there, he was told that ''they would take the properties.'' On Dietrich's return to Detroit, he secured the consent of Lane to the use of his company's name in making the purchases, ''providing Fisher & Company would give him a protective agreement back protecting him against loss or liability.'' It appears that such an agreement was entered into as to certain of the purchases or leases.

A preliminary contract was soon after entered into with plaintiffs and some others, in which the

Wesbrook-Lane Realty Corporation appeared as purchaser. After conferences between Dietrich, Lane and Bitting, it was decided to organize the Wesbrook-Lane Properties Corporation, and this was done and land contracts and leases were entered into by it as vendee and lessee. This corporation was organized on December 7, 1928, with a capital stock of $25,000, later increased to $50,000, all of which was contributed by the New Center Development Corporation. None of the Fishers nor Bitting appeared as stockholders therein. The name was changed in 1930 to United Realty & Construction Company. Dietrich testified that he secured contracts and leases of properties, under his arrangement with Bitting, with obligations of over $1,500,000. He also testified that before he made an offer for any particular piece of property he would obtain Bitting's authority to do so, and that when money was needed to make a payment on property he would call Mr. Bitting or Mr. Shields, the assistant secretary of the New Center Development Corporation, or Howard A. Fisher, the vice-president thereof, one of the Fisher brothers, but not a stockholder in Fisher & Company, and tell him how much was needed and the money would be deposited to his credit in the bank in which he did business and he would use his personal checks in making payment. In answer to one of these requests sent to Mr. Shields, he received a reply, upon the letterhead of which appeared "Fisher & Company Incorporated inter-organization letters only." He also testified that when the contract with plaintiffs was prepared it was O. K.'d by him and also by Charles A. Wagner, an attorney for Fisher & Company, by the use of their initials.

Corporations are creatures of the law. Under them, individuals may engage in business and avoid

the danger of dissolution incident to a partnership on the death of a copartner. Their immunity from corporate obligations is a basic element of the corporate concept, and will be abrogated only when there is an abuse of the privilege granted to do business in a corporate form—in other words, a fraud upon the law.

In *People, ex rel. Attorney General,* v. *Michigan Bell Telephone Co.,* 246 Mich. 198, 204 (P. U. R. 1929 B, 455, P. U. R. 1929 E, 27), this court said:

"Where a corporation is so organized and controlled and its affairs so conducted as to make it a mere instrumentality or agent or adjunct of another corporation, its separate existence as a distinct corporate entity will be ignored and the two corporations will be regarded in legal contemplation as one unit. * * * When a corporation exists as a device to evade legal obligations, the courts, without regard to actual fraud, will disregard the entity theory."

In *Old Ben Coal Co.* v. *Universal Coal Co.,* 248 Mich. 486, the plaintiff sought to recover against an undisclosed principal. Appeal was taken from an order dismissing the declaration. It was there said:

"In determining whether in truth and fact the Universal Coal Company was the agent, tool, or instrumentality of the Price Hill Colliery Company, the court may 'look through forms to substance, and ignore a mere colorable corporate entity to the end that the rights of third parties shall be protected,' quoting from *Spokane Merchants Ass'n* v. *Clere Clothing Co.,* 84 Wash. 616 (147 Pac. 414)."

The articles of association of the Wesbrook-Lane Properties Corporation state that there were five stockholders therein, John C. Lane, Carl A. Dietrich, Wesley Schroeder, B. A. Garland and H. M.

Cowan; 100 shares were issued in the name of each of them, and indorsed by them and turned over to the New Center Development Corporation. Other names appear as directors and officers in the annual reports filed for 1929, 1930, and in that filed by the United Realty & Construction Company in 1931.

Under the proofs submitted, it seems to be clearly established that this corporation was organized for the purpose of securing contracts and leases of property in its name which Fisher & Company intended to use in a development in the city of Detroit, and it performed no other service.

The testimony of Dietrich, and it is undisputed, establishes the fact that Bitting, after consulting with some of the officers of Fisher & Company, authorized him to secure commitments for the purchase and leasing of this property. In what he thereafter did pursuant thereto, Dietrich was acting as the agent of Fisher & Company, and, when the contracts and leases were secured in the name of the Wesbrook-Lane Properties Corporation, the relationship was not changed; this corporation was but acting as the agent or instrumentality of Fisher & Company, through which and by which it obtained that which it sought.

The New Center Development Corporation was a mere subsidiary of Fisher & Company. Its office was in Detroit, and the fact that it furnished the capital for the organization of the Wesbrook-Lane Properties Corporation in no way changed the relationship of Fisher & Company to that corporation.

A corporation may have a subsidiary and exercise the control over its affairs usual to stockholders. It must, however, be organized and its affairs conducted in such a manner that people dealing with it will have reasonable protection in the obligations it

assumes. The Wesbrook-Lane Properties Corporation was incorporated with but $25,000 of capital, and while so capitalized it incurred obligations amounting to more than $1,500,000. The increase to $50,000 affected it but little. It seems clear that the corporate privilege was thus abused and that its separate existence as a corporate entity should be ignored where the rights of persons who have dealt with it are affected thereby.

In *Chicago, M. & St. P. Ry.* v. *Minneapolis Civic & Commerce Ass'n,* 247 U. S. 490 (38 Sup. Ct. 553), the court, after referring to its decisions holding—"that ownership, alone, of capital stock in one corporation by another, does not create an identity of corporate interest between the two companies, or render the stockholding company the owner of the property of the other, or create the relation of principal and agent or representative between the two," said:

"While the statements of the law thus relied upon are satisfactory in the connection in which they were used, they have been plainly and repeatedly held not applicable where stock ownership has been resorted to, not for the purpose of participating in the affairs of a corporation in the normal and usual manner, but for the purpose, as in this case, of controlling a subsidiary company so that it may be used as a mere agency or instrumentality of the owning company or companies. *United States* v. *Railroad Co.,* 220 U. S. 257, 273 (31 Sup. Ct. 387), and *United States* v. *Railroad Co.,* 238 U. S. 516 (35 Sup. Ct. 873). In such a case the courts will not permit themselves to be blinded or deceived by mere forms or law but, regardless of fictions, will deal with the substance of the transaction involved as if the corporate agency did not exist and as the justice of the case may require."

In *Centmont Corporation* v. *Marsch* (C. C. A.), 68 Fed. (2d) 460, 463, the court said:

"There are many cases in the books where this issue has been considered, and it is obvious that the result depends upon the facts in each case. The rule is often laid down that mere stock ownership or identity of executive officers will not alone be sufficient to establish one corporation as the agent or instrumentality of another. But it is equally well settled where, in addition, it appears that the business carried on by the subsidiary is a part of the business of the holding company, and the holding company dominates the affairs of the subsidiary through its stock ownership and common officers, and actually directs the affairs of the subsidiary as a part of its own business, for which purpose the subsidiary was organized, that the courts will look through the corporate form and hold that in such cases a subsidiary is a mere adjunct to or instrumentality for carrying on the business of the holding company."

In a somewhat recent publication, "Parent and Subsidiary Corporations, Powell," the author discusses at length the question here presented, and reviews the decisions applicable thereto. We quote therefrom (pages 14 and 15):

"Manifestly the fact that the subsidiary's capital is wholly disproportionate to the amount of the business that it actually conducts, is strong proof that it is a mere dummy or arm of the parent corporation. * * *

"This does not impugn the principle that the parent corporation may finance the subsidiary without subjecting itself to liability. That the parent corporation should be the principal or sole source of the subsidiary's credit from time to time, is one thing. But that it should launch the subsidiary in

business without furnishing the appropriate funds
or obligating itself to do so, is quite another. If
the subsidiary is financially helpless and, through
the fault of the parent corporation, can call on the
parent corporation for capital funds only when and
if the parent corporation pleases to grant them, it is
cogent evidence that the subsidiary is a mere tool
in the hands of the parent.''

2. Mr. Gledhill testified that he received his last
payment from a man named Chapel; that when the
next one came due he called up Chapel and was told
by him to write to Howard Fisher about it; that he
did so and got no reply; that he again called Chapel,
and was told by him that the matter had been placed
in the hands of B. A. Garland; that he and Mrs.
Gledhill went to Garland's office by appointment
and Garland said to him:

"That 'the mission this morning is to tell you that
the United Realty & Construction Company is bank-
rupt. There is no more money in the company to
pay any bills. What we want you to do is sign a
cancellation of the contract.' He said further that
everyone else was signing up or had agreed to sign
with the exception of two who were out of town.
Then I questioned, 'What about the Wesbrook-Lane,
are they bankrupt?' He says, 'You didn't sell to
the real Wesbrook-Lane.' I says, 'I didn't sell to
the real Wesbrook-Lane?' He said, 'No.' 'Well,'
I says, 'Who then?' 'Why,' he says, 'you sold to a
company that was organized up there to purchase
and deal in real estate in that vicinity, and specu-
late,' and I asked him then, 'Well, have the Fishers
any interest in it?' He says, 'They have not, leave
the Fisher name out of it, they have no interest
whatever.' I then asked him if I could see Mr.
Chapel, and he said, 'Yes,' he said, 'you can see Mr.
Chapel.' He took down the phone and called

Mr. Chapel, and Mr. Chapel made an appointment for 1:30 that afternoon. This conversation took place at 720 Fisher building.

"We came back at that time, and Mr. Garland was there (720 Fisher Building) and my wife and I, and the same conversation transpired then that transpired in the morning, except that Chapel told us when I asked him if the Fishers had any interest in it, 'Well, go ahead and find out, you prove it if you think they have.' Of course, I had no way of proving it at that time, I had no thought that I had sold to the Fishers. I always thought I had sold to the Wesbrook-Lane people, and I knew Frank Wesbrook and the Wesbrook family was well enough off to buy my piece of property, and Mr. Weeks' piece of property. Mr. Garland repeated the same things that he told us in the morning, about the company being bankrupt, that they had no more money, etc., and Mr. Chapel just sat there and didn't hardly open his mouth except when he told me to go ahead and prove it. There was some talk that Mr. Crawmer and Mr. Burghart and maybe one or two others were interested in the United Realty & Construction Company."

He further testified that he went to the county building and saw the annual reports of the company and found its condition was just about as Garland had. represented it to be; that Garland afterwards raised the money to pay the last half of the city taxes for 1931, and urged himself and his wife to sign the cancellation agreement, saying "that the Fishers did not own it or have anything to do with it," and that they then signed their names to it.

Mrs. Gledhill testified that she was present at the meetings with Garland and Chapel and participated in the conversation had, and corroborated her husband as to the statements made by them.

Mr. Garland, as a witness for the defendants, denied that he had made many of the statements testified to by the plaintiffs. Mr. Chapel did not testify.

In our opinion the weight of the evidence supports the finding of the trial court in this respect and justified the rescission of the cancellation agreement.

3. Counsel for the defendants insist that, as the land contract was executed under seal, it may not be reformed. This defense was not set up in the answer nor attention called to it upon the hearing. In our opinion it is not before us for consideration.

4. At the time the land contract was entered into, and also at the time of its cancellation, there was a two-family flat upon the lot in question. Plaintiffs afterwards removed it and used the lot for parking purposes. The trial court was of the opinion that, if the contract was reinstated and reformed, an allowance should be made to Fisher & Company for the worth of this building. Testimony was taken as to its value at the time it was demolished, and an allowance of $5,000 made by the court therefor in the decree rendered. The plaintiffs have appealed therefrom.

The values testified to ranged from approximately $2,100 to $7,750. The trial court heard and saw the witnesses who testified, and in our opinion the allowance made by him should not be disturbed.

The decree should be affirmed. As both parties have appealed, no costs should be allowed.