Joseph W. NOLAN et al., Libellants,

v.

Leo JENSEN et al., Respondents.
No. 7719.

United States District Court
E. D. Virginia,
Norfolk Division.
March 17, 1959.

352

Jett, Sykes & Howell, Henry E. Howell, Jr., Norfolk, Va., for libellants.

Seawell, Johnston, McCoy & Winston, John W. Winston, Norfolk, Va., for respondents.

WALTER E. HOFFMAN, District Judge.

This is a salvage action, civil and maritime, instituted by libellants against the respondents, Leo Jensen, Arvid Hetland Basse and Tormod Hetland Basse, partners trading as Basse & Company, and A. H. Basse Rederi Aktieselskab, *in personam*. Libellants are the master and crew members of the tug "L.T.–1953", owned by the United States Army, and on August 19, 1953, performed salvage operations off the coast of Newfoundland in salvaging the SS Else Basse owned by the respondent Danish joint stock company.

A companion action involving salvage claims against the *cargo only* was heard and determined by the United States District Court for the Eastern District of Pennsylvania. Nolan v. A. H. Basse Rederi Aktieselskab, D.C., 164 F.Supp. 774, 1958 A.M.C. 1462. The facts are sufficiently stated therein. Undeniably, if *in personam* jurisdiction has been obtained or waived in this action, libellants are entitled to a salvage award for their efforts in salvaging the hull of the SS Else Basse.

The original libel filed on May 16, 1955, named A. H. Basse Rederi Aktieselskab, owners or bareboat charterers of the SS Else Basse, as respondents. The marshal attached the SS Paris as the property of the respondent. On the following day, May 17, 1955, an amended libel was filed against the respondents hereinabove mentioned, and the SS Paris was reattached. In the interim proctors for respondents notified proctors for libellants that a wrongful attachment had been effected at the instance of libellants, and that respondents would look to libellants' proctors for damages. At the request of proctors for libellants a hearing was held on May 18, 1955, to determine whether probable cause existed for the issuance of the attachment. Proctors for respondents appeared *specially* for the owners of the SS Paris. After considering such evidence as was available at the time, the Court concluded that reasonable cause existed for the issuance of the monitions. The master of the SS Paris then filed his claim in behalf of the owners and, upon the posting of a release bond in the sum of $50,000, the vessel sailed. The SS Else Basse has not been within the jurisdiction of this court.

On June 3, 1955, respondents, appearing specially, filed exceptions to the jurisdiction and motions to quash the service of process, alleging in substance that (1) no personal service had been obtained upon any respondent or upon any respondent's corporate officer or agent; (2) the attachment had not been levied upon any property owned by any respondent, individually or collectively; nor upon property operated or controlled by the corporate respondent; (3) the respondents did not own, operate or control the Danish SS Paris but, on the contrary, the Paris was solely owned, operated and controlled by Dampskibsselskabet Pacific A/S, a Danish corporation; (4) none of the individual respondents owned a controlling interest in Dampskibsselskabet Pacific A/S, and the corporate respondent neither owned nor controlled any interest in said corporation, designated for brevity as "Pacific", nor did Pacific own any interest in the corporate respondent.

By reason of libellants' contention that respondents have waived the *in personam* jurisdiction, it is necessary to relate the events subsequent to the filing of said exceptions and motions to quash. On

July 8, 1955, a pre-trial conference was conducted at which time, due to the congestion of the court docket and the fact that proctors advised the court of the necessity of taking testimony abroad and through the medium of depositions, the hearing on the exceptions and motions to quash was scheduled for December 23, 1955. At the same time the Court fixed a conditional date for the trial of the merits on April 16, 1956. By stipulation dated December 9, 1955, but filed on December 12, 1955, it was agreed that certain depositions, taken in New York for use in an identical proceeding then pending in the Southern District of New York, could be introduced in evidence at the trial of this action on its merits. The stipulation further provided:

"In consideration thereof, it is further stipulated that libellants agree to a continuance of the hearing on respondent's Exceptions to Jurisdiction and Motion to Quash Service of Process Under a Special Appearance, from December 23, 1955, until some date selected by proctors for respondents, such date not to be after the date of trial on the merits, should such Exceptions and Motion to Quash be overruled by the Court. Such selected date shall, of course, be a date on which both the Court and proctors for libellants are available.

"By signing this stipulation respondents do not in any way appear generally or waive their special appearance or their Exceptions to Jurisdiction and Motion to Quash Service of Process Under a Special Appearance previously filed."

Having been advised of respondents' intention to proceed by way of Letters Rogatory in . Denmark, where respondents' evidence on the exceptions and motions to quash would be taken, Letters Rogatory were issued by the Court on December 12, 1955, upon interrogatories propounded and filed by proctors for respondents on December 12, 1955, and cross-interrogatories thereafter propounded by proctors for libellants on

January 30, 1956. The cumbersome procedure of obtaining translations into the Danish language through the Danish Embassy, and forwarding same to Denmark through the United States Department of State, was most time-consuming. As the trial date of April 16, 1956, approached, proctors for the parties met with the Court at respondents' request for a continuance of the trial date due to the fact that no answers to the interrogatories had been received.

On April 12, 1956, the Court entered an order granting a continuance of the trial date from April 16 to July 3, "on the *condition* that the respondents shall agree that all testimony taken and exhibits introduced at the hearing had before this Court on or about May 18, 1955, may be admitted into evidence on behalf of either the libellants or respondents and further, that the respondents shall pay the cost of transcribing the original of this testimony" and upon *further condition* "that both libellants and respondents shall procure any testimony desired to be taken by deposition, or in any written form, on or before June 1, 1956, and any testimony that is to be taken by deposition, or any other written form, may not be tendered after that date, this condition being created so as to afford both parties ample time to be informed as to the deposition testimony in advance of trial."

It will thus appear that the Court, being unaware of the merits of respondents' exceptions and motions to quash previously filed, *required* the parties to proceed with the preparation of the case on its merits. While undoubtedly proctors for respondents were not especially prompt in attending to the Letters Rogatory, the delays are not considered unreasonable in light of the difficulties presented.

Thereafter, on May 17, 1956, proctors for respondents gave notice of the taking of depositions of witnesses in New York on May 23. At the commencement of said depositions, proctors for respondents stated for the record that the depositions were being taken by respond-

ents subject to the special appearance noted, and as required by the Court's order of April 12, 1956. Proctors for libellants replied that the question of waiver of privilege constituted a matter of law; it being the first intimation that libellants were contending that jurisdiction had been waived.

On May 28, 1956, libellants filed a motion requiring the production of documents and, on the following day, an order was entered requiring respondents to produce said documents for inspection on or before June 20, 1956.

On May 31, 1956, the respondents, appearing specially and without waiving their exceptions to jurisdiction and motions to quash the service of process, filed their answers to the libel and amended libel.

When the trial date of July 3, 1956, arrived, the answers to the interrogatories had not yet been received from Denmark. Proctors for respondents exhibited to the Court a cablegram indicating that depositions of witnesses had been taken before The Maritime and Commercial Court of Copenhagen on June 20, 1956, June 21, 1956, and June 27, 1956, with the hearing then adjourned to July 4, 1956. Faced with this situation, the Court proceeded to hear the case on its merits on July 3, 1956. On July 9, 1956, libellants filed a request for admission of facts pursuant to Rule 32B of the General Admiralty Rules, 28 U.S. C.A., to which respondents, without waiving exceptions to jurisdiction and motion to quash service, moved to quash the request filed under Rule 32B. Again on July 25, 1956, libellants filed an additional request for admissions under Rule 32B, and once again respondents moved to quash without waiving their prior exceptions and motions filed. However, on September 17, 1956, respondents answered this latter request for admissions, reserving their rights under the exceptions previously filed.

The Letters Rogatory were received by the Clerk on or about August 29, 1956. As they were in Danish, the Court directed, on September 6, 1956, that they be transmitted to the Danish Embassy for translation. The Letters Rogatory were translated and returned to the Clerk on October 18, 1956. On October 29, 1956, in a communication to proctors, the Court stated in part:

"I have read with interest the Letters Rogatory which have been submitted. The exceptions to the jurisdiction have never been finally determined by the Court. There is a stipulation in the file to the effect that the exceptions to the jurisdiction and motion to quash the service of process should be determined in advance of final hearing. Now that the Letters Rogatory have apparently been concluded and filed, it appears to me that the exceptions should be argued at length. If the exceptions are sustained, further testimony of libellants as to value would be unnecessary. If the exceptions are overruled, libellants could then take the testimony of H. B. Miller, or any other party having knowledge of the value of the 'Else Basse', and the case would be concluded.

"Assuming that you care to argue the exceptions, I would like for counsel to present in summary form the details showing the alleged interlocking operations of Jensen, et als, as well as the Danish corporations involved in the operation of the three vessels referred to in the evidence. I would also like to have the benefit of all authorities on the jurisdictional question. If each of you will take approximately two weeks to prepare your argument on the jurisdictional phase of the case, I shall be pleased to assign a date for argument at which time Mr. Howell may, if he elects to do so, endeavor to persuade me to the contrary as to my tentative views relative to the evidentiary value of the Miller survey and the hypothetical questions predicated thereon."

Many months then passed without action by proctors but finally, on August

9, 1957, the Court heard oral argument on the exceptions to jurisdiction and motions to quash the service of process. As early as November 6, 1956, in a letter to proctors, the Court said in part:

"There are some conflicting answers in the letters rogatory which may indicate that the Danish term 'owner' is somewhat different from the term 'owner' as used in this country."

The Letters Rogatory disclosed the following pertinent interrogatory and answer thereto by Arvid Hetland Basse:

"Q.6. Who on May 16 and 17, 1955, was the owner of the Danish Steamship Paris?

"A. Re 6. The witness and Leo Jensen."

The respondent, Jensen, stated that A. H. Basse, Leo Jensen and T. H. Basse were the "owners" of the Paris. When Tormod Hetland Basse testified, he stated, in referring to the word "owner", as follows:

"The witness understands the American expression 'owner' to mean the managing owner; that was A. H. Basse."

This apparent misunderstanding of the term "owner" as used by the Danish respondents created some concern in the mind of the Court, and, upon suggestion of the Court, the parties were granted leave to produce in open court the testimony of such witnesses as would be able to enlighten the Court.

Following oral argument on August 9, 1957, libellants, on August 14, 1957, sought to take the deposition of a witness in Philadelphia on the next day. Respondents, appearing specially and without waiving prior exceptions and motions, moved to quash the notice to take depositions on August 15, for the reason that libellants contended the attendance by proctors for respondents at said deposition would constitute a general appearance and a waiver of prior jurisdic-

tional rights asserted, and, further, that libellants declined to enter into a stipulation that the appearance of proctors for respondents at said deposition would constitute only a special appearance.

At the hearing on the motion to quash the notice to take the deposition in Philadelphia, the Court entered an order on August 15, 1957, reciting the contentions of the parties, and providing in part:

"Wherefore, It Is Ordered that the Libellants shall not take the deposition of Captain Jakobsen unless they stipulate that the Respondents may examine said witness without prejudicing Respondents' special appearance. However, this Order in no way affects the actions taken by the Respondents prior to this date, and the question of whether or not the Respondents have heretofore effected a general appearance is taken under advisement by the Court, to which action of the Court Libellants except."

The deposition of the witness, Jakobsen, was taken by libellants at Philadelphia on August 16, 1957, with proctors for respondents appearing pursuant to a stipulation entered into by virtue of the Court's order of August 15.

Several additional months passed before the hearing of November 27, 1957, at which time Michel Riemert, a Danish law expert, testified pursuant to the Court's request as expressed at the time of oral argument. The witness, a barrister to the Supreme Court of Denmark,[1] has served as barrister for the respondents, but his testimony was forthright and persuasive. He described the word "owner" as foreign to the Danish language. If this word is presented to a Dane, it would be translated as "reder", which would essentially mean the "manager" of the vessel or vessels who performs day-to-day work on behalf of the titled shipowner, or, it may refer to a person in a company doing ship-owning

---

1. A "barrister" in Denmark is the full equivalent of an American attorney. The distinction between a "barrister" and "solicitor" as it exists in England does not prevail in Denmark.

business, or, it may also refer to a person who personally has the title of ownership of a vessel or vessels. The expert further stated that "Basse and Company" had no legal status as such; that it is. essentially a trade name. What is known in our. country as a "corporation" is referred to in Denmark as a "joint stock company"—a board of directors of not less than three persons has general control of the company, supervising its activities, and ascertaining that it is managed in accordance with the law—in some instances where the capital is 100,000 kroner or less, the board of directors will actually conduct the day-to-day operations—in other instances, a managing director or managing directors are appointed to perform these duties, and the term "managing director" is similar to our "business manager". Frequently the "manager or group of managers" own a share interest in the joint stock companies for whom they are doing business.

From the evidence adduced it is apparent, and admitted, that the Else Basse was titled in the name of A. H. Basse Rederi Aktieselskab, a Danish joint stock company similar to an American corporation. It is also conceded that the Paris, attached by the marshal at Norfolk, was titled in the name of Pacific, a Danish joint stock company. The managing operators of both joint stock companies were the individual respondent or respondents. Individuals having stock interests in Danish joint stock companies have the same protection from individual liability as in the case of stockholders in the average American corporation. Basse & Company, a trade name, was operated by the individual respondents and, as a part of its business, it served as "managing agents", or "business managers", for six joint stock companies, including those companies holding the legal title to the Else Basse, the Paris, and the Egaa. Irrespective of the statements of Arvid Hetland Basse that he was the "owner" of the Else Basse on August 19, 1953, when this vessel was salvaged, and that, on May 16–17, 1955, he, together with Leo Jensen, were the "owners" of the Paris, the Court finds that the true owners of said vessels, as the word "owner" is used in the United States, were the Danish joint stock companies as above noted. Accordingly, the Paris did not constitute the property of any of the named respondents and could not, therefore, be lawfully subjected to a foreign attachment proceeding in the Eastern District of Virginia.

Nor does the Court believe that the actions of the individual or corporate respondents constituted an estoppel in fact or in law. The confusion existing as to semantics negatives any intent to mislead or misrepresent. Moreover, Lloyd's Register of Shipping, the shipping "Bible" as to vessel ownership, management, etc., lists the Else Basse as owned by "A. H. Basse A/S (Basse & Co., Mgrs.)", and the Paris as owned by "Dampskibsselsk Pacific A/S (Basse & Co., Mgrs.)." To the outside world title to the two vessels was clearly shown, and Basse & Company was reflected as "managers" for the vessels. It is of little moment that, in correspondence, Basse & Company pointed to themselves as "owners" of the vessels. It is simply a matter of semantics.

There exists no justification for piercing the corporate veil. As to the named corporate respondent, the Register of Corporations reflects that it was organized in 1947 with a subscribed capital of 2,500 kroner, divided into 25 fully paid up shares. Its founders were A. H. Basse, T. H. Basse and K. J. Larson, who constituted the board of directors. The "managing owner" or business manager was A. H. Basse. In 1949 the corporate respondent acquired by purchase the Else Basse, and the share capital was increased to 100,000 kroner. The 100 shares of stock are divided between seven individuals with A. H. Basse holding the majority interest as of January 1, 1956. In 1954, after the vessel was damaged by fire, Mrs. Else Basse replaced T. H. Basse on the board of directors.

The corporation designated as "Pacific" was created in 1919 and none of the present interested parties were then on its board of directors. The business

manager was Laurits Rudolph Schmith. The original subscribed capital of 600,000 kroner was divided into 600 shares of fully paid stock. In 1940 the respondent, Leo Jensen, is first mentioned in the corporate records as one authorized to sign for Pacific. In 1947 Jensen became a member of the board of directors, at which time he had a connection with L. R. Schmith & Co.; the latter being designated as business manager to replace Laurits Rudolph Schmith who resigned. L. R. Schmith & Co. then had the same business address as now held by Basse & Co. As of January, 1950, Pacific acquired title to the Paris. On March 21, 1952, A. H. Basse, T. H. Basse and Robert Fischer-Nielsen were named as members of the board of directors; L. R. Schmith & Co. resigned as business manager and Basse & Co. was appointed in that capacity. The share capital had previously been increased in 1947 to 1,800,000 kroner in fully paid up shares. The 1676 issued shares are divided between seven individuals, three trusts, one Foundation, and two corporations. Of the two corporations, one is Pacific itself—apparently in the nature of treasury stock. The other corporation, D/S Hetland A/S, is listed as the holder of 1435 shares, the majority interest. The capital stock of D/S Hetland A/S consists of 735 shares divided between sixteen individuals, with A. H. Basse and T. H. Basse each holding 245½ shares.

From the foregoing it will be noted that A. H. Basse has the controlling interest in the corporate respondent herein, which was the registered title owner of the Else Basse. The controlling interest in Pacific (the registered title owner of the Paris) is in another corporation, D/S Hetland A/S, and this last named corporation is susceptible of joint control by the combined activities of A. H. Basse and T. H. Basse, but neither could control against the will of the other.

On the voyage which resulted in the attachment of the Paris the charter party dated February 18, 1955, reflects that it is signed by the charterer and by "Dam-pskibsselskabet Pacific A/S (Basse & Co., Mgrs.), owners of the Danish S.S. Paris, by Benham & Boyesen, Inc., as Brokers only". This charter party is very similar to that as disclosed in Isbrandtsen Co. v. Lenaghan & Lenaghan & Sons, Ltd., D. C.S.D.N.Y., 128 F.Supp. 662, 664, 1955 A.M.C. 80. In previous charter parties Henry P. Lenaghan had been designated as owner of the vessel. In the disputed charter party the wording appeared "Henry P. Lenaghan & Sons, Managers, for owners of the good British motorship Empire Glencoe", and was signed "For and on behalf of Henry P. Lenagahan & Sons Ltd., Henry P. Lenaghan, Director". A vessel, the Dundalk Bay, admittedly owned by Henry P. Lenaghan & Sons, Ltd., was seized under a foreign attachment on a claim involving the alleged breach of charter party for the Empire Glencoe. In quashing the attachment, the court said:

"The various documents offered by libellant in support of the attachment suggest no more than the notion that Henry P. Lenaghan & Sons, Ltd., was manager for the owners. The fact that the company, rather than the individual, dealt with the libellant with respect to credits and other business does not support the claim that the company owned the Empire Glencoe. And I find no authority for imposing obligations upon a manager for defaults of an owner. It is generally understood that a 'manager' is an agent. 2 Bouv. Law Dict., Rawle's Third Revision, p. 2073; 55 C.J.S. Manager, page 3. It goes without saying that an agent is not obligated in contract where his principal is disclosed. It is clear that libellant knew from the charter parties prior to the cable exchanges who owned the Empire Glencoe.

"In the absence of a claim and/or showing that Lenaghan and his company were indistinguishable, I can come to no other conclusion than that Henry P. Lenaghan & Sons, Ltd. was not a party to the charter

party out of which the grievance arose and that, therefore, libellant had no right to attach its vessel."

In principle, the foregoing authority fits this case "like a glove". A similar situation arose in American Anthracite & Bituminous Coal Corp. v. Amerocean S.S. Co., D.C.E.D.Pa., 131 F.Supp. 244, 248. There, a vessel was titled in one corporation, the stock of which was wholly owned by the alleged debtor corporation. Despite the fact that the corporate officers were identical, the court declined to pierce the corporate veil, saying:

"However, the cases uniformly hold that there must be something more than the identity of officers as well as stock ownership in corporate set-ups in order to disregard the corporate fiction. In order to brush it aside it must appear that it was organized for a fraudulent purpose or that some injury has resulted to someone from the transaction, something of fraud, something of illegality or wrongdoing, or something where the moving party has cause for complaint in connection with the transaction."

To the same effect, see: Certain-Teed Products Corp. v. Wallinger, 4 Cir., 89 F.2d 427; Cannon Mfg. Co. v. Cudahy Packing Co., 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634; Ruberoid Co. v. North Texas Concrete Co., 5 Cir., 193 F.2d 121; Gledhill v. Fisher & Co., 272 Mich. 353, 262 N.W. 371, 102 A.L.R. 1042; Beale v. Kappa Alpha Order, 192 Va. 382, 64 S.E.2d 789.

■ This is not a case of fraud on the part of the respondents; nor have the libellants been lulled into any sense of security by misleading representation. Only in a "proper case" may corporate entity be disregarded, and the facts herein presented do not justify such action. We are not concerned with the problem presented in the recent "flag of convenience" cases as in Bobolakis v. Compania Panamena Maritima San Gerassimo, D.C. S.D.N.Y., 168 F.Supp. 236.

This brings us to a consideration of the final point, namely, that respondents waived their special appearance by taking depositions in New York on May 23, 1956, and by participating in the trial of the merits on July 3, 1956, as well as answering the libel. Libellants urge adherence to the rule as stated in Norfolk Southern R. Co. v. Foreman, 4 Cir., 244 F. 353, limiting the party protesting jurisdiction from soliciting, asking, or seeking to procure any action of any kind on the merits until the decision on jurisdiction. The general rule appears in 6 C.J.S. Appearances § 1(2) (c), p. 9, as follows:

"An appearance originally special is waived or converted into a general appearance if the appearing party, before the special appearance has been ruled on, does some act which amounts to a general appearance."

See also: 6 C.J.S. Appearances § 13; Massachusetts Bonding & Insurance Co. v. Concrete Steel Bridge Co., 4 Cir., 37 F.2d 695. A more detailed discussion of the views of this Court will be found in Efentakis v. The S/T World Legion, D. C.E.D.Va., 165 F.Supp. 773.

■■ Without finding fault with the general rule, it is well to note that, in the present case, any action taken by respondents as to the merits came as a result of the Court's insistence, prompted by the insistence of proctors for libellant, that the matter be delayed no longer while awaiting receipt of the Letters Rogatory. At all times respondents made it clear that they were preserving their rights under the special appearances. They, certainly, at no time intended to waive such rights. In Citizens' Savings & Trust Co. v. Illinois Central R. Co., 205 U.S. 46, 59, 27 S.Ct. 425, 429, 51 L.Ed. 703, the court said:

"The plaintiff contends that this condition was waived, and the general appearance of the defendants entered, when their counsel, at a hearing as to the sufficiency of the pleas to the jurisdiction, argued the merits of the case as disclosed by the bill. This is too harsh an interpretation of what occurred in the

court below. * * * The discussion of the merits was permitted or invited by the court in order that it might be informed on that question in the event it concluded to consider the merits along with the question of the sufficiency of the pleas to the jurisdiction. We are satisfied that the defendants did not intend to waive the benefit of their qualified appearance at the time of filing the pleas to the jurisdiction."

The question of general appearance is ordinarily one of *intent*, actual or implied. Grable v. Killits, 6 Cir., 282 F. 185, 195, certiorari denied sub nom., Bacon Bros. v. Grable, 260 U.S. 735, 43 S.Ct. 95, 67 L.Ed. 488; Dahlgren v. Pierce, 6 Cir., 263 F. 841. A litigant will not, of course, be heard to say that he did not intend the natural consequences of clear and unequivocal acts. Ervin v. Quintanilla, 5 Cir., 99 F.2d 935.

Libellants well know that, had the Court been advised of their intention to insist upon a waiver of the special appearance, the trial on its merits would have been indefinitely postponed. To urge the Court to grant an early trial date for the purpose of forcing a respondent into a general appearance is a practice which does not meet with favor.

In United States v. Brown, 2 Cir., 55 F.2d 72, 73, the defendant, who had entered a special appearance, took the witness stand at the request of the court during the defense of his case, although his attorney at all times made it clear that defendant's appearance was special. The district court held that, by participating in the trial, defendant had made a general appearance; in reversing, the appellate court said:

"* * * not enough was done under the special appearance for Lieberman to amount to submission to the jurisdiction."

See: United States v. Collins, 2 Cir., 55 F.2d 70, decided along with United States v. Brown, supra.

We think it a safe rule to follow that a party appearing specially may nevertheless obey the orders of any court, even to the extent of participating in the trial of the merits, without waiving the special appearance. In obeying the orders of the court, the party having noted a special appearance does not solicit, ask, or seek to procure any action of any kind on the merits. To hold otherwise would invite contempt proceedings, as well as judgments or decrees by default.

On the basis of this record the respondents had no property within the district which could be attached. The motions to quash the service of process and the exceptions to jurisdiction are sustained, thereby dismissing the action.

Adopting this memorandum in lieu of specific findings of fact and conclusions of law in accordance with General Admiralty Rule 46½, proctors for respondents will prepare and present an appropriate decree.