**In the Matter of U.S. TRUCK COMPANY, INC., a Michigan corporation, Debtor.**

**Bankruptcy No. 82–03561–BE.**

United States Bankruptcy Court, E.D. Michigan, S.D.

Aug. 30, 1984.

Opinion Sept. 7, 1984.

See also, Bkrtcy., 42 B.R. 790; Bkrtcy., 42 B.R. 787.

Barbara Rom, and David Murphy, Detroit, Mich., for Unsecured Creditors' Committee.

Gerry Miller, Milwaukee, Wis., for Teamsters' Union.

Joseph S. Radom, Southfield, Mich., for debtor.

Timothy K. Carroll, Special Labor Counsel, Detroit, Mich.

FINDINGS OF FACT AND CONCLUSIONS OF LAW AND ORDER APPOINTING TRUSTEE

STANLEY B. BERNSTEIN, Bankruptcy Judge.

*Introduction*

On June 18, 1982, U.S. Truck Company, Inc., a Michigan corporation, (Debtor) filed a Chapter 11 petition with this Court. On August 1, 1984, the Official Unsecured Creditors' Committee (Committee) filed an application to appoint a trustee; on August 10, 1984, the Committee filed a supporting memorandum.

On August 10, 1984, the Debtor filed its answer and affirmative defenses to the Committee's motion. In that responsive pleading the Debtor raised a constitutional challenge to this Court's authority to enter appropriate judgments and orders. At is-

sue is § 121(e) of the Bankruptcy Amendments Act of 1984 which continues every bankruptcy judge sitting on the effective date of the Act, July 10, 1984, for a four-year term from the date of last appointment or until October 1, 1986, whichever is the later date.

Among the allegations asserted by the Committee in support of its motion was the Debtor had failed to effect a plan of reorganization after more than two years from the commencement of this case. The Committee attributed that failure to a stalemate in the negotiations for a new collective bargaining agreement with the Teamsters. The responsive pleading filed by the Debtor averred that the stalemate arose from the Teamsters' Union's refusal to bargain in good faith.

The hearing on the motion was scheduled for August 9, 1984. After reviewing the pleadings joining the issues, this Court consulted with the District Court. The District Court determined that it appeared that a mandatory withdrawal of the reference of the Chapter 11 case to the District Court was required under 28 U.S.C. § 157(d) because the determination of the issues also appeared to require consideration of the National Labor Relations Act. This Court adjourned the hearing on the motion; the next day, the District Court entered an order withdrawing the reference of the case under § 157(d), and remanding it to this Court with limiting instructions. This Court was authorized to enter appropriate orders in core proceedings if no consideration of the National Labor Relations Act was required, and to submit proposed findings of fact and conclusions of law to the District Court if such consideration was required.

This Court rescheduled the hearing for August 22, 1984. The Teamsters made an oral application for intervention as a creditor before the Committee made its opening statement, and the Court granted the motion over the Debtor's objection. The Committee supported the intervention.

An oral motion was made by the Debtor for the appointment of substitute labor counsel, Timothy K. Carroll, Esq., solely for purposes of this hearing and other motions then pending. The primary argument was that a member of the firm previously appointed as special labor counsel might have to be called as a witness; rather than argue over the disqualification, the Debtor sought substitute special labor counsel. The motion was granted over the objections of the Committee and the Teamsters' Union.

After the Committee and Teamsters' Union concluded their direct proofs, the Debtor moved to have the instant motion denied. The Court denied the Debtor's motion, but ruled that the granting or denying of the Committee's motion would not be based upon the causes for the stalemate or, by implication, upon any consideration of correlative duties of the Debtor and the Teamsters' Union to bargain in good faith under the National Labor Relations Act. In view of this ruling, the Court stated that it would enter an appropriate order granting or denying the motion as a core proceeding and as authorized under the order of the District Court. The Court further ruled that the constitutional objection was frivolous and adopted the analysis prepared by the Legislative Reference Service of the Library of Congress. A copy of the Service's memorandum had been circulated to all counsel on August 9, 1984. Counsel for the Debtor failed to submit a supporting memorandum on the constitutional issue by August 22, 1984, more than ten days after its responsive pleading to the motion had been filed; the Court denied the Debtor's request for further time to file a brief on this issue.

The hearing on the Committee's motion was held on Wednesday, August 22, 1984 from 9:00 a.m. to 10:30 p.m. by which time the Committee and Teamsters' Union had concluded their proofs in chief. Arguments were then heard on the Debtor's oral motion to dismiss the Committee's motion. The hearing continued for a second day on Thursday, August 23, 1984 beginning at 10:00 a.m., the Debtor was directed to proceed with a detailed opening statement.

That day of hearing continued until 5:00 p.m.

The Debtor sought a continuance of the hearing until Wednesday or Thursday of the next week to prepare further because the focus of the hearing had changed from the effect of the stalemate in the labor negotiations to the nature and extent of control and domination of the Debtor by affiliated companies referred to by all as the Central Group. The Court noted that the issue of control and domination had been presented in the Committee's supporting memorandum. The Court, however, acknowledged that the testimony of John Schroeder, called by the Committee as an adverse witness, brought the issue of control and domination to the fore. (Schroeder was the person designated by prior Court order as the "responsible person" for the Debtor in Possession.) The Court granted the continuance until Tuesday, August 28, 1984 over the objections of the Committee and the Teamsters' Union.

One of the external constraints in this hearing was the expiration of this judge's appointment on August 31, 1984. That expiration date was established in my letter of resignation submitted to the District Court on April 2, 1984. The fact became public knowledge and was surely known by the parties to the motion. This motion was the last matter to be heard by me; no successor has been appointed. On September 1, 1984, my formal association with a firm in Los Angeles was scheduled to begin. I undertook to hear this motion assuming that it would be heard on August 9, 1984 and because I had been administering this Chapter 11 from November 17, 1983, including numerous contested hearings affecting the administration of the case. All parties, with varying degrees of enthusiasm, concurred that it would be more efficient as a matter of judicial administration for me to conclude the hearing on this crucial motion.

At the inception of the third day of the hearing separate motions to intervene were asserted by Central Transport Company and by McKinley Transport Company. These motions had not been scheduled for hearing nor reviewed by the Court. Central Transport Company claimed an unsecured claim of $10,000 and sought to intervene as a creditor and as a party in interest by virtue of the allegations of control. The Court announced that the motion would not be granted, nor denied, because of its untimely filing in the middle of the hearing, and the inability of the Court to consider it at that time. Central then moved for a continuance; that was denied. McKinley Transport applied for the appointment of itself as a one-member equity security committee, and for the appointment of counsel to be paid by the Debtor's estate. The Court refused to permit counsel to continue his presentation because the motion was frivolous and interposed solely for delay; the Court, however, declined to rule on that motion too.

After these initial skirmishes, the hearing on the third day continued and concluded at 8:30 p.m., with frequent recesses.

Counsel for the Debtor sought a continuance until the next day to complete his proofs by presenting a single witness. The motion for a continuance was granted over the objections of the Committee and Teamsters' Union.

At the commencement of the hearing on the fourth day at 8:30 a.m. the Debtor rested and did not call its last witness. The Committee recalled John Schroeder, President of U.S. Truck, for brief questioning on net operating losses, and then called its consultant, Richard Skillinger, to give his opinion as an expert on limited matters. Counsel concluded their closing statements by 11:00 a.m.

The motion to appoint a trustee had been pending since August 1, 1984, and the Committee in its supplemental memorandum had clearly raised the issue of the control and domination of U.S. Truck by the Central Group. The Debtor had an opportunity to prepare its defense on that issue from August 10, 1984. (Indeed it seems that the Teamsters raised that issue in various ways every time the Union appeared before the Court. The primary source of evidence

on the issue of control was the testimony of the President of the Debtor when called as an adverse witness. The pleas of surprise and prejudice by the Debtor supporting repeated requests for continuances were completely groundless. Mr. Schroeder knew in elaborate detail the full extent of that control and domination.

At the conclusion of the proofs, the Court solicited nominations of trustees from all parties in the event that the motions were granted. The parties were given until 4:00 p.m. to submit nominations. Both the Debtor and the Committee submitted nominations for trustee. The Court waived any submissions of proposed findings by the parties in order to reduce costs and to avoid delays. The Court agreed to render its opinion by no later than Friday, August 31, 1984.

*Findings of Fact*

1. On June 18, 1982, the Debtor filed its petition under Chapter 11.

2. The trade creditors and employees of the Debtor are owed on their general unsecured claims not less than $3,000,000.

3. The National Labor Relations Board has filed a contingent claim for damages arising from the alleged unfair labor practices committed by the Debtor occurring after this Court's predecessor authorized the Debtor to reject the pre-petition collective bargaining agreement with the Teamsters.

4. On August 2, 1984, the Teamsters' Union filed an amended proof of claim for more than $5,000,000 based upon damages arising from the rejection of its collective bargaining agreement. The Debtor has not filed objections to that claim.

5. The Central States Pension Fund has filed a contingent claim for withdrawal liability in excess of $8,000,000.

6. The Debtor has not entered into a new collective bargaining agreement with the Teamsters' Union, which is recognized as enforceable by both parties.

7. The Debtor has incurred an aggregate net operating loss of $1,640,232 through June 30, 1984. (Debtor's Exhibit 3.)

8. The Debtor is a wholly owned subsidiary of McKinley Transportation Company, a Michigan corporation (McKinley). (Stipulated).

9. McKinley is a wholly owned subsidiary of Flanvi Corporation, a Canadian corporation. (Stipulated).

10. Agnes Ann Maroun (Ms. Maroun) owns all of the outstanding stock of Flanvi, and is a resident of Grosse Pointe, Michigan. (Stipulated).

11. Agnes Ann Maroun owns approximately 15% of the outstanding stock of Centra Corporation (Centra). (Stipulated).

12. The majority of the outstanding stock of Centra is owned by Ms. Maroun, her brother, father, and one or more sisters. (Stipulated).

13. Centra owns all of the outstanding stock of Central Transport Company, a Michigan corporation, Central Cartage Company, a Michigan corporation, and GLS Leasco, a Michigan corporation (Leasco), (collectively the Central Group). (Stipulated).

14. Ronald Lech is the Executive Vice-President of each of the corporations of the Central Group and acts as the financial adviser to Ms. Maroun. (Testimony of J. Schroeder and R. Champagne).

15. John Schroeder is the sole director, and the President of the Debtor; he holds no interest as an equity security holder of the Debtor. (Testimony of J. Schroeder).

16. During the course of this Chapter 11 case, the Debtor vacated possession of substantially all of its terminals, each of which was owned by the Debtor free of liens and encumbrances, with the exception of its Detroit terminal, which is mortgaged to Manufacturers National Bank of Detroit. (Testimony of J. Schroeder).

17. During the course of this Chapter 11 case, the Debtor relocated its freight operations to terminals owned by Leasco or Central Cartage. (Testimony of J. Schroeder and R. Champagne).

18. None of the terminals presently occupied and used by the Debtor are subject to a written lease. (Testimony of J. Schroeder and R. Champagne).

19. The rent term of the oral agreements covering the terminals was not negotiated between the Debtor and Leasco or Central Cartage, but was unilaterally fixed by the Central Group's director of real estate, Raymond Champagne, acting under directions of Ronald Lech. (Testimony of R. Champagne).

20. The rent term was based upon 20% of the expenses incurred by Leasco or Central Cartage for each terminal, regardless of the number of loading bays or doors used by the Debtor. The expenses included property taxes, guard and janitorial services, utilities, insurance, and similar costs. (Testimony of R. Champagne).

21. The oral leases are terminable at will by Leasco or Central Cartage. (Testimony of R. Champagne).

22. All of the data processing, billing and collection of accounts, and maintenance of customer lists is performed by the Central Group for the Debtor. (Testimony of J. Schroeder).

23. The Debtor has not retained its own accountant in this case to prepare its monthly financial statements, and the Debtor's books and records have not been audited during this case. (Testimony of R. Clawson).

24. All of the new trailers, tractors, and hi-los used by the Debtor during this case have been leased or supplied to the Debtor by Leasco or Central Cartage. (Testimony of J. Schroeder).

25. Mr. Schroeder did not seek competitive bids for any of the leased equipment, nor did he nor any other officer of the Debtor negotiate any of the terms of the leases. (Testimony of J. Schroeder).

26. The leases for the equipment from Leasco are all oral and are terminable at will by Leasco or Central Cartage. (Testimony of J. Schroeder).

27. The Debtor could not operate its business if Leasco or Central Cartage terminated the oral leases for equipment and terminals. (Testimony of J. Schroeder).

28. The amount of the current monthly payments, based upon the June, 1984 statement, by the Debtor to the Central Group under oral leases for equipment, terminals, and other goods and services is approximately $320,000 (Exhibit 6).

29. All important decisions regarding the leasing, purchase, or sale of assets, the retention and compensation of special counsel or the chairman of the labor negotiating team; the initiation, prosecution or defense of litigation and of appeals; and the compensation and funding of the Debtor's plan are made by Ronald Lech or Ms. Maroun. (Testimony of J. Schroeder).

30. Prior to McKinley's acquisition of the Debtor, the Debtor and Central Transport were chief competitors in hauling freight for the automotive industry within the state of Michigan, Central being No. 1 and the Debtor being No. 3 in terms of market shares. (Testimony of J. Schroeder).

31. Hauling freight for the automotive industry represents 85% of the gross annual sales of the Debtor. (Testimony of J. Schroeder).

32. Under the customs and practices of the automotive trucking industry, the shippers identify a primary carrier and two supplemental carriers. (Testimony of J. Schroeder).

33. For the majority of its customers in the automotive industry for which the debtor is either a primary or supplemental carrier, Central Transport is also one of the other two primary or supplementary carriers. (Testimony of J. Schroeder).

34. If the Debtor were liquidated, Central would be joined on the list of primary and supplemental carriers by another carrier which it did not control and which would be competitive with it. (Testimony of J. Schroeder).

35. Under the present circumstances, Central could readily and immediately di-

vert all of the Debtor's freight business to itself. (Testimony of R. Skillinger).

36. The Debtor filed its third amended plan during the concluding phase of this hearing. (Debtor's Exhibit 4).

37. The Creditors' Committee rejected the terms of the Debtor's third amended plan prior to the commencement of the hearing on the present motion. (Testimony of C. Taunt).

*Conclusions of Law:*

A. The Debtor has and continues to engage in gross mismanagement of its business operations by having surrendered virtually all of its significant decision-making authority to the executive officers of the Central Group or Ms. Maroun.

B. The Debtor has and continues to engage in gross mismanagement of its business operations by having entered into oral leases or contracts for its equipment of trailers, tractors, and hi-los, the supply of fuel and other inventories, and for all data-processing, billing and collections of receivables when those leases or contracts are immediately terminable at will by the Central Group.

C. The Debtor has and continues to engage in gross mismanagement of its business operations by having surrendered access to all of its customer lists and other financial data such that the Central Group may readily and immediately divert to its own use all of the business opportunities of the Debtor.

D. The Central Group totally controls and dominates the management and property of the Debtor.

E. The control and domination of the Debtor by the Central Group can be exercised solely for the interests of the Central Group or its equity security holders without any consideration of the interests of the creditors of the debtor's estate.

F. The Central Group has collected very substantial revenues on the current magnitude of $3,800,000 annually through its control and domination of the Debtor during these proceedings, notwithstanding the very substantial net operating losses of over $1,600,000 through June of 1984.

G. The delay of more than two years without a plan of reorganization in a Chapter 11 of this character and the net operating loss through June of 1984 of over $1,600,000 are by themselves prejudicial to the interests of the creditors of the estate.

H. Until the withdrawal liabilities asserted by the Central States Pension Fund are satisfactorily resolved, the Debtor has no ability to effect a plan of reorganization.

I. The simple facts that the Debtor cannot operate if its oral contracts and leases are terminated by the Central Group, and the oral contracts and leases are terminable at will by the Central Group, make the Debtor's projected income completely speculative and uncertain. Therefore, the Debtor's third amended plan is not feasible.

J. The third amended plan filed by the Debtor cannot be confirmed because the Debtor cannot as a matter of law prove that the plan is feasible.

K. The appointment of a trustee is required under 11 U.S.C. § 1104(a)(1) when the Debtor has engaged in gross mismanagement.

L. The appointment of a trustee is required under 11 U.S.C. § 1104(a)(2) when it is in the interest of the creditors of the estate.

M. The conversion of a Chapter 11 case to Chapter 7 or the dismissal of the case is required when under 11 U.S.C., § 1112(b)(2), the Debtor has no ability to effectuate a plan of reorganization.

N. The conversion of a Chapter 11 case to Chapter 7 or the dismissal of the case is required under 11 U.S.C. § 1112(b)(3) when unreasonable delay in a case is prejudicial to the creditors.

O. The appointment of an operating trustee in a Chapter 11 case is a less drastic remedy than conversion or dismissal.

P. Findings to support the conversion or dismissal of a Chapter 11 case constitute "cause" for the appointment of a trustee under 11 U.S.C. § 1104(a)(1).

Q. The foregoing findings of fact and conclusions of law compel the immediate appointment of a trustee in this case.

The motion of the Unsecured Creditors' Committee for the appointment of a trustee is GRANTED.

The Court will appoint an individual, partnership, or professional corporation to the office of trustee after considering the nominations submitted by the Committee and the Debtor.

IT IS SO ORDERED.

## OPINION

The Creditor's Committee of U.S. Truck Company, Inc. seeks appointment of a trustee in this Chapter 11 case under 11 U.S.C. § 1104(a). The Teamsters' Union sought and was granted leave to intervene in the Committee's motion.

The proceedings in this Chapter 11 case have had a long and tortuous history since the petition was filed on June 18, 1982. Although several plans of reorganization have been filed by the debtor, none has met the statutory requirements for confirmation.

The debtor operates a trucking company primarily engaged in intrastate shipping of parts and supplies for the automobile industry. The debtor's chain of corporate relationships is fairly complicated. There are two major branches. The debtor is a wholly owned subsidiary of McKinley Transportation Company, a holding company. McKinley, in turn, is a wholly owned subsidiary of Flanvi Corporation. All of Flanvi's stock is owned by Agnes Ann Maroun. U.S. Truck has two subsidiaries, West End Cartage Company and U.S. Pool Car Company, the assets of which have been liquidated; both subsidiaries filed Chapter 11 petitions.

The second branch is headed by Centra Corporation, in which Ms. Maroun holds an approximate 15% interest; various members of the Maroun family own the remaining interests in Centra. Centra owns all of the stock of Central Transport, Central Cartage and GLS Leasco. This branch is commonly referred to as the Central Group.

McKinley acquired the debtor corporation shortly before the Chapter 11 petition was filed. Following that acquisition, much of the debtor's and Central's business operations were consolidated. The debtor, which had been operating out of its own terminals (all of which it owned free and clear of any liens except for the Detroit terminal), vacated those facilities and moved its operations to Central's terminals in each city. Most of its equipment, such as tractors, trailers and hi-los, was sold to the Central Group and the debtor now rents or leases substantially all of its equipment from the Group. The debtor's data processing needs are now fulfilled by the Group, including payroll, invoicing, collection of account receivables, and maintenance of customer lists and business volume figures. The Central Group also provides the debtor with its fuel needs, tires, tire recapping, truck parts and paper stock. The debtor did not request or receive court approval of these leases.

The motion for the appointment of a trustee was based upon the Committee's concern over the increasing control and domination exerted over the debtor by the Central Group, as well as the Committee's determination that the debtor's delay in effecting a confirmable plan was prejudicial to the unsecured creditors. The concern over the relationship between the Central Group and the debtor gained increasing prominence during the extended hearing on the appointment of a trustee.

The debtor's president and sole director is John Schroeder; Mr. Schroeder does not hold any stock in that corporation. His candid and most credible testimony revealed the true extent to which this debtor has ceased to exist as an independent and autonomous entity. Mr. Schroeder testified that the leases for terminal space and for equipment between debtor and Central are not written and are not for any stated period of time. He also admitted that the debtor did not solicit any competitive bids prior to entering into those leases, but rath-

er that all the negotiations for the various leasing arrangements were arranged by or through Ronald Lech. Mr. Lech, who is a vice president of most of the Central Group entities and the financial advisor of Ms. Maroun, is not an officer, director, shareholder or employee of the debtor.

Raymond Champagne, the Central Group's director of real estate, testified that the lease "negotiations" for the debtor involved a unilateral determination by Mr. Lech of the terms and conditions. Mr. Champagne corroborated Mr. Schroeder's testimony that all of these leases are unwritten and are terminable at will by the Central Group. He also revealed that the lease rates are generally at or below market rates, and often substantially below market rate. The rental payments reimburse the Central Group for a pro-rata share of expenses for owning and operating the terminals.

The vast majority of the debtor's business comes from hauling freight for the automobile industry. Mr. Schroeder testified that the Central Group is the debtor's chief competition for the auto industry work and that between Central and U.S. Truck they command the first and third shares in the present market.

Mr. Schroeder also testified that all major decisions concerning the debtor, including disposition of assets, the retention and compensation of counsel and other professionals; the initiation, prosecution or defense of litigation and appeals; and the negotiation and funding of various proposed plans of reorganization, are all made by Agnes Ann Maroun or Ronald Lech. Mr. Schroeder admitted that frequently he is neither consulted with prior to the making of these decisions, nor is he informed of the decisions once made.[1]

■ The conclusion that this debtor is totally controlled and dominated by the Central Group—its purported primary com-

petitor—is inescapable. This is a factually unique situation for purposes of analysis under 11 U.S.C. § 1104(a)(1). The reported decisions under that section which discuss gross mismanagement usually involve situations in which the debtor has failed to maintain adequate books and records, or has comingled funds of the debtor with those of the corporation's principals or affiliates. Presented with those facts, the courts are easily able to determine whether the creditors' interests have been prejudiced and thus determine the appropriateness of the appointment of a trustee.

Typical of such cases is *Hotel Associates, Inc. v. Central States SE and SW Areas Pension Fund (In re Hotel Associates, Inc.)*, 3 B.R. 343 (Bankr.E.D.Penn.1980). That court appointed a trustee after finding that the debtor's accounting system was totally inadequate to reflect its financial condition accurately. Moreover, the court determined that the debtor failed to maintain minimally adequate procedures and controls for the operations of the debtor's hotel business.

In *Dardarian v. La Sherene, Inc. (In re La Sherene, Inc.)*, 3 B.R. 169 (Bankr.N.D. Ga.1980), the debtor was the third insolvent business venture of its principal shareholder. The court determined that although that majority shareholder possessed the requisite creative and artistic talents to promote the enterprise, his business and financial capabilities were nonexistent. The debtor corporation had been under capitalized and had had inadequate cash flow since its inception. Despite its chronic financial instability, the corporation's management personnel persisted in drawing excessive compensation and provided themselves with luxurious housing and automobiles from the corporate funds. Most cases where a trustee was appointed involve similar factual situations. *See In re Ford*, 36 B.R. 501 (Bankr.W.D.Ky.1983) (debtor made intercorporate loans and transfers

---

1. Mr. Schroeder testified that he did not know the company had filed charges with the National Labor Relations Board against the Teamster's Union several days prior to this hearing, nor did he know that the debtor had filed an emergency application with the Sixth Circuit Court of Appeals on August 22, 1984. Mr. Schroeder's first knowledge of these events came from hearing the arguments of his counsel on August 22, 1984.

without court permission and without disclosure in its monthly financial reports); *In re Brown*, 31 B.R. 583 (D.D.C.1983) (debtor's principal mismanaged parking garage by refusing to sell or lease that property to maximize distribution to creditors in order to retain that property for his individual control and operation); *In re Philadelphia Athletic Club, Inc.*, 15 B.R. 60 (Bankr.E.D. Penn.1981) (principal self-dealing and commingling of funds with principal's other corporation). None of the reported decisions involve a complicated corporate structure as is presented here, nor is there any reported decision in which the debtor is controlled and dominated by nondebtor entities and thus beyond the reach of the court and the debtor's creditors.

Although none of these reported decisions presents a factual situation identical or closely analogous to the one here, they are instructive in determining what actions constitute sufficient mismanagement to warrant the appointment of a trustee. The *Ford* decision points out that undisclosed transfers of assets is a ground for the appointment of a trustee—that surely took place here. The *Brown* decision imposes a sanction for the debtor's failure to liquidate surplus assets—that is the case here when as counsel for the trustee stated during the hearing that the vacated terminals were retained for future use by Ms. Maroun. If an inability or wilfull failure to maintain accurate books and records constitutes sufficient jeopardy to the creditors of the estate is cause for the appointment of a trustee, certainly a debtor's surrender of its autonomy to the extent that it is impossible to evaluate that debtor's independent financial condition is sufficient cause for a trustee's appointment.

The reported decisions which do examine such parent domination of a subsidiary usually turn on issues involving piercing the corporate veil or state antitrust considerations. Although those decisions are not

controlling here, the policy considerations behind the development of those standards are instructive and applicable to the present case.

The traditional view of the situation in which the courts may disregard the corporate entity is described in early cases of Michigan corporate law. Most frequently cited is *Gledhill v. Fisher & Co.*, 272 Mich. 353, 262 N.W. 371 (1935), in which the plaintiff had sold a sizeable parcel of real property to Wesbrook-Lane Properties Corporation in 1928 for $125,000. Westbrook was a wholly-owned subsidiary of the New Center Development Corporation, which in turn was a wholly owned subsidiary of Fisher & Company, a closely held corporation.[2] The land contract was defaulted upon in 1931, with an unpaid balance in excess of $100,000. The plaintiff sought to pierce the corporate veil to collect that balance from Fisher & Company.

The Michigan Supreme Court did an extensive analysis of the liability of a parent corporation for the obligations of its wholly owned subsidiaries. The court held that before such liability will be imposed, it must be shown:

> [That] not only that undue domination and control was exercised by the parent corporation over the subsidiary, but also that this control was exercised in such a manner as to defraud and wrong the complainant, and that unjust loss or injury will be suffered by the complainant as the result of such domination unless the parent corporation be held liable.

*Id.* at 358, 262 N.W. 371.

This standard has been stated in numerous manners without any drastic substantive charge, however, its application has been modified to impose liability upon the parent with higher frequency. *See Action Plumbing & Heating Co. v. Jared Builders, Inc.*, 368 Mich. 626, 118 N.W.2d 956 (1962) (principals and related corporations

---

**2.** The Fisher family name is a legend in Michigan. The family name is the source of the Fisher Body Division of the General Motors Corporation. The property in dispute in *Gledhill* was located in the area known as the New

Center Area of Detroit, the home of the world headquarters of General Motors and the Fisher Building, both of which are recognized landmarks.

held liable for breach of construction contract by defendant where funds were intermingled and principals took unauthorized loans from corporate funds); *Shirley v. The Drackett Products Co.*, 26 Mich.App. 644, 182 N.W.2d 726 (1970) (product manufacturer held liable for injuries caused by product sold by its wholly owned subsidiary distributor where that subsidiary existed solely as the distributing arm of the manufacturer and was the manufacturer's only source of revenue.)

An early Michigan antitrust case is also illuminating. A gravel company sought damages against a railroad for damages incurred from the railway's operation of its subsidiary gravel corporation. *Federal Gravel Co. v. Detroit & Mackinac Railway Co.*, 263 Mich. 341, 248 N.W. 831 (1933). The opinion indicates that the gravel and railroad businesses were interdependent. Railroads used large quantities of gravel for ballast in its track beds, thus the railways were substantial purchasers of gravel and supplied a major market for the gravel companies. The other major market for gravel was the state, which used the product for highway construction.

By forming its own gravel corporation, the railroad was able to meet its own gravel needs substantially below market price. It also began selling its excess gravel commercially, using its ability to transport that gravel on its own tracks. By implementing a system of freight rebates to its own subsidiary, the train company was able to sell its gravel at below the cost of the gravel's production.

The court determined that this complicated arrangement constituted "unjust discrimination" against the plaintiff in that the parent was essentially gratuitously financing the subsidiary. The Supreme Court found that the railroad completely managed the affairs of the gravel company despite its formal existence as a separate and distinct legal entity.

The situation is remarkably similar to the present one. The debtor has lost on an aggregate basis approximately one and one half million dollars from the filing of its petition through June of 1984. In the past few months, the debtor has operated profitably, and has been reducing the earlier and higher aggregate post-petition operating losses. These recent profits may well be illusory. All of the debtor's operating expenses, from terminal space, to equipment, to fuel and tires, and down to the letterhead used in its offices, is being subsidized by the Central Group. This Court and the creditors have no way to determine whether this debtor has the ability to reorganize absent this tremendous subsidy. Every plan of reorganization proposed by the debtor has not only included various financing schemes by the Central affiliates, but it has also presumed the continued subsidization of the debtor without any enforceable guarantee of the continuation of the below market lease arrangements.

These Michigan corporation cases are applicable here because they reflect the well developed policy that the law will not allow the corporate form to be used as a device to deceive or defraud third persons in their dealings with the corporation. It is the duty of the Court to look beyond the appearances of the corporate entity to determine the propriety of its actions as those actions affect others. This Court, therefore, must look beyond the appearance of corporate existence of this debtor, to determine if the estate and its creditors are being unreasonably jeopardized.

Although this debtor may well continue to exist and operate at the largess of the Central Group, that continuation could end at any time before or after confirmation of any plan. The prejudice to the creditors is thus as real and as detrimental as if no records were kept or funds were commingled; this situation may be even more insidious because it is more difficult to ascertain and predict. The mismanagement of this debtor corporation is clearly gross mismanagement as contemplated by § 1104(a)(1). This debtor has allowed itself to become totally controlled and dominated by another entity without any concern whatsoever for the protection of the estate and the best interest of creditors. For all

practical purposes, U.S. Truck Company, Inc., does not exist—the Central Group provides and controls its life support system. At any time and for any reason, the Central Group can pull the plug on U.S. Truck; it will be dead immediately. It is essential that a trustee be appointed to review this hopelessly entangled situation, preserve whatever business and assets the debtor possesses, and determine whether this corporation can continue without further undue risk to its creditors.

As an alternative ground for granting the motion to appoint a trustee, the Court relies upon the debtor's inability to effectuate a plan. 11 U.S.C. § 1112(b)(2). Before this hearing began, the last plan of reorganization submitted by the debtor had been struck by order of this Court. An appeal had been taken of this order but the appeal was subsequently withdrawn; thus, the Court's striking of that plan has become final. On the third day of the hearing on the motion to appoint a trustee, the debtor filed a third amended plan. From testimony of Mr. Schroeder it is apparent that the plan has to be amended again.

No disclosure statement was filed in conjunction with the third amended plan and I do not know what my successor will do with respect to the approval of that disclosure statement, nevertheless, from the admissions made by the debtor during the course of this hearing, it is undeniable that no plan of reorganization can be effected. That inability is attributed, in large part, to the unresolved dispute with the Central States Pension Fund which has reserved the right to assert withdrawal liability numbering in the millions of dollars. The Creditors' Committee has already rejected the plan as infeasible—it was presented orally before the hearing began. Indeed, the full measure of control by the Central Group adds the possibility of U.S. Truck Co., Inc.'s bearing even a greater liability for withdrawal if withdrawal liability is asserted against any of the Central Group companies. Moreover, a substantial liability arising from the rejection of the collective bargaining agreement by the debtor also has to be estimated or determined.

That, too, may have an adverse effect on the debtor's ability to effect a plan of reorganization.

Even without these substantial and unlitigated liabilities, it would appear that no court would confirm a plan of reorganization in this case. Confirmation requires proof that the debtor will not have any further need for funding and can avoid liquidation. 11 U.S.C. § 1129(a)(11). Under the present circumstances there is no way that the debtor can satisfy that test. Its future earnings are wholly dependent upon the largess of the Central Group. The debtor has no contractual remedies to enforce with respect to the basic provision of its facilities, inventories, or data processing. Under those circumstances, the company can be closed down in a day for whatever business reasons the Central Group deems appropriate. With no assurance for future operation, this debtor cannot satisfy the conditions for confirmation.

Quite clearly U.S. Truck is being run for the convenience of the Central Group and if U.S. Truck no longer serves that convenience, its reason for being will end. This Court cannot operate in the Central Group fantasy land. Reality has to intrude in the form of a trustee. It may well be the case that the appointment of a trustee will result in the immediate cessation of all business activities—not because of any decisions by its primary customers, but by a business decision of the controlling Central Group. It will then become incumbent on a trustee to move this case immediately into conversion and to resort to the legal remedies available to the trustee.

■ At this juncture, the debtor has operated under Chapter 11 for more than two years without having filed a confirmable plan. That long and unreasonable delay is prejudicial to the interest of the creditors of this estate, and is itself a basis for conversion, dismissal, or the appointment of a trustee. 11 U.S.C. § 1112(b)(3). *See In re Larmar Estates, Inc.*, 6 B.R. 933 (Bankr.E.D.N.Y.1980); *Weatherfield*

*Farms, Inc. v. First Interstate Bank,* 15 B.R. 282 (D.Vt.1981).

The motion for the appointment of a trustee is GRANTED.